THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER LEONARD, Appellant.

Second Department, July 18, 1977

1

*Stephen J. Pittari* for appellant.

*Carl A. Vergari, District Attorney (Janet Cunard* of counsel), for respondent..

MARGETT, J. This case arises out of a tragic fire which took the lives of 24 people when a discotheque in Port Chester was destroyed on the night of June 29-30, 1974. The discotheque, Gulliver's, was located in a building complex situated on the Connecticut-New York border. It was adjoined by a bowling alley, Carol Lanes.

On Sunday, June 30, Detective Sergeant Ambrose of the Greenwich, Connecticut Police Department was assigned to investigate the fire. Two days later, on July 2, 1974, Detective Solomon of the Connecticut State's Attorney's office was also assigned to the investigation. The next afternoon, July 3, Detective Ambrose contacted the defendant and asked him to come to police headquarters.[1] Defendant did so and was advised that Detective Ambrose was investigating an attempted burglary of a Homelite store. The store was located about 100 feet from the Gulliver's complex and was separated from it by a parking lot. The attempted burglary had been discovered on the night of the fire.

Detective Ambrose told defendant that he had been seen running from the Homelite store into Carol Lanes. During the course of their conversation, defendant admitted that he tried to break into the Homelite building at 10:15 P.M. on the night

---

1. Detective Ambrose could not recall whether he personally contacted defendant or had him contacted. In any event, defendant appeared at police headquarters at about 5:15 P.M.

in question. He admitted to breaking a window and a glass door, but said he got scared, left, and entered the bowling alleys. The confession was reduced to writing and signed by defendant at 6:06 P.M. However, defendant was not placed under arrest. He was told instead that Detective Ambrose would make application to the court for his arrest and would call him when he received the arrest papers. According to Detective Ambrose, defendant could have been placed under arrest at that time.

On the following Monday, July 8, Ambrose contacted defendant at the request of Detective Solomon and asked defendant to again appear at Greenwich police headquarters the next day. Also on Monday, July 8, Detective Solomon made arrangements to use a State's Attorney's office in Bridgeport on July 11 so that he and the other detectives could "talk" to the defendant.[2]

On Tuesday, July 9, defendant appeared at Greenwich police headquarters at 9:00 A.M. Ambrose and Solomon spoke with defendant for about two hours; Solomon advised defendant that he was investigating both the Homelite "burglary" and the fire. Defendant again admitted trying to break into the Homelite building and stated that when he was unable to enter, he ran to the bowling alley and knocked on the side door. Two acquaintances who worked there let him in so that he could use the men's room. He did so and went back outside after three or four minutes. This statement was reduced to writing at about 12:00 noon. Defendant was again permitted to leave, but before he did Detective Solomon asked him whether he would be willing to submit to a polygraph examination regarding the statement he had just given. Defendant stated that he would be willing and Solomon said he "would try to arrange one in the very near future to try to clear all this up."

The following afternoon, between 4:00 and 4:30 P.M., Ambrose and Solomon advised defendant that arrangements had been made for him to take the test the next morning at the State Police Barracks in Bethany, Connecticut. Detective Solomon had, in fact, made arrangements for the test; had notified

2. Detective Ambrose testified that on Monday (July 8), Detective Solomon checked with a State's Attorney "to find out if this office would be made available for him and us to talk to Peter Leonard." Although one cannot be sure that the exact date of July 11 was reserved at that time, it is clear that arrangements were made in advance for interrogation of defendant in Bridgeport.

the examiner that the testing was to be with regard to the Gulliver's fire; and had participated in framing some of the questions to be asked. Defendant stated that he had no way of getting to Bethany and Ambrose offered to transport him. Defendant was also told that Detective Solomon and Detective Lovallo, of the Port Chester Police Department, would accompany him.

The next morning (July 11, 1974), at 7:00 A.M., Detective Ambrose met defendant in front of his house. According to Ambrose, defendant was "very excited" and "upset" as a result of a fight he had just had with his mother over a $5 parking ticket. He had forgotten to pay the ticket and as a result the fine had been increased to $25. Ambrose asked defendant whether he still wanted to take the polygraph examination and received an affirmative answer. Ambrose then asked defendant if he had eaten breakfast and, when he received a negative answer, he offered to stop for breakfast after picking up Detective Lovallo. Defendant declined, stating that he wanted to "get it over with."

Lovallo was picked up at the Port Chester Police Department and subsequently Solomon was met in Bridgeport. The three detectives and defendant then proceeded to Bethany, a distance of approximately 30 miles from Bridgeport and 60 miles from defendant's home near Greenwich. Upon arrival in Bethany at about 8:50 A.M. Detectives Ambrose and Solomon conferred for about one hour with Sergeant Dewey, the polygraph examiner. During this period of time, Detective Lovallo remained with defendant.

At about 9:50 A.M. defendant was introduced to Sergeant Dewey, who interviewed him prior to the commencement of the polygraph examination. The detectives who had accompanied defendant were able to listen to this interview in another room and, in fact, Detective Solomon did so. Sergeant Dewey told defendant that he wanted to help him; that the polygraph is a recording instrument that records emotional changes "inside" a person, and something to the effect that it "could read his insides and tell whether he was truthful or not"; and he "may have" indicated his confidence in the accuracy of the polygraph machine. Dewey ascertained that defendant was 22 years of age; that he had consumed two six-packs of beer the night before; that he had gone to bed at 3:00 A.M. and arisen at 6:00 A.M.; that he had been treated by a psychiatrist five years previously on four occasions; that he had gone as far as

the 10th grade; and that he had taken LSD one month prior to the test. The defendant also told Dewey that he was tired and that he had a headache.

Following these preliminaries which took 30 to 40 minutes, defendant was taken to the polygraph testing room for the actual examination. This room was not only wired for sound, but contained a one-way mirror through which defendant could be visually observed; Detective Solomon did so. Defendant was questioned as to his whereabouts on the evening of June 29 and the early morning hours of June 30. Upon completion of the series of questions, Dewey wanted to run through them again but defendant asked that the testing be stopped, saying that he did not feel up to continuing with the test. At some point thereafter he stated that he felt ill.

Defendant's wishes were complied with, but, before leaving, Dewey advised the detectives that in his opinion defendant was lying. As defendant was signing out, Dewey indicated to him that he did not believe he had been truthful. Dewey further stated to defendant that he had enough polygraph charts to know that either defendant "did it" or knew who did it—referring to the "break into the Carol Lanes and the fire that ensued." Defendant responded "Yeah, you're right." Thereupon Dewey asked him who did it and got no answer. Dewey posed the question a second time and got a denial.

At about 11:00 A.M. defendant and the detectives departed Bethany. Either at the time they entered the car or on the way to the car, Detective Solomon told defendant that from what Dewey had seen, it appeared that defendant had been lying. Detective Solomon testified this was "discussed" in the car. He stated also that there was a "general conversation" about the results of the test; defendant was not told their destination. Detective Ambrose testified that there was no conversation whatsoever in their vehicle. In any event, both Solomon and Ambrose agree that 5 to 10 minutes down the road defendant told them that he had lied and that he had broken into the bowling alleys. Solomon then asked defendant whether he would be willing to accompany them to the State's Attorney's office in Bridgeport to give a further statement as to that burglary. Defendant assented.

Upon arrival in Bridgeport at about noon, Solomon sent out for lunch for the four of them. All of them, including defendant, ate lunch and, immediately thereafter, Solomon commenced questioning defendant in the office of an Assistant

State's Attorney. The conversation commenced at about 1:00 P.M. and concluded at 1:45 P.M., when a written statement was typed by Solomon. This statement was to the effect that defendant had broken into the bowling alley shortly after 10:30 P.M. on the night in question; that after stealing some cigarettes from a machine he looked around for anything else of value; that he was smoking a cigarette which he accidentally dropped down a stairway; that he was pretty sure the cigarette butt was out; and that he left with the stolen cigarettes and a radio at about 11:45 P.M. With respect to the cigarette which fell down the stairway, defendant elaborated that it landed somewhere in a corner outside the door to a nursery; he thought it fell on a carpet and close to paneling located outside the nursery room.

Just prior to typing this statement, Solomon had asked Ambrose to call the fire marshal investigators from the Connecticut State Police who were at the scene of the fire in Greenwich/Port Chester. Upon completion of the written statement at about 2:30 P.M., Solomon left defendant with Ambrose and Lovallo and went into another room to confer with the fire investigators. Solomon showed them defendant's statement and solicited their professional opinion as to whether the fire could have started as a result of a lit cigarette outside the nursey room. They did not state that the fire could not have been been caused by a cigarette, but did express the opinion that the fire started inside the nursery room—not outside the room.

Within one-half hour, Solomon returned to the room where defendant was being kept and told him that the "professional people," the fire investigators, "didn't agree with" his statement as to how the fire could have started; that "it wasn't possible." Solomon asked defendant if he was withholding anything; if he had lied. He further asked if defendant had gone inside the nursery. After further questioning defendant admitted that he had entered the nursery during the course of his burglary. He told Solomon that he was smoking a cigarette which he attempted to put out in a trash can within the nursery. He stated that the trash can was located in the corner of the room—to his extreme right as he entered through the glass doors. He thought the trash can was metal, but he was not certain. He said he left the room in a hurry because he thought he heard noises. This statement was reduced to writing at 3:50 P.M. In addition, defendant drew a

diagram of the nursery room, showing the location of the trash can in relation to the doors.

Defendant was again left with Lovallo and Ambrose while Detective Solomon conferred a second time with the fire investigators. The investigators advised Solomon that the trash can was not where defendant said it was. Although Criminal Term would not permit testimony as to where the fire investigators thought the fire started, it is clear that Detective Solomon did receive such an opinion at that time. Solomon returned to the room where defendant was located and "told him" that the can was not in the spot defendant had indicated. Defendant then stated that the trash can "may not have been there or it wasn't there." He stated he remembered there was a toy box filled with plastic toys and stuffed animals in that corner of the room—in the same place where he had previously recalled the location of the trash can. (Solomon had previously heard about this toy box from other people.) Defendant stated he had walked along the wall because it was dark in the nursery; that he had bumped the cigarette against the wall and that the lit end of the cigarette had fallen into the toy box. Defendant then moved toward a television set in the room and planned to steal it. However, a short time later a burst of flames started in the toy box. Defendant attempted to reach into the toy box to put the fire out, but his hands were starting to get burned. Defendant got scared and left the building. This statement, given at approximately 4:30 P.M., was never reduced to writing.

At this point, Detective Solomon conferred with the State's Attorney, who directed that he and Detective Ambrose draw up an affidavit for defendant's arrest on charges of burglary. Solomon returned to the room where defendant was being held, and told him he was going to be arrested for burglary in the third degree. Solomon and Ambrose proceeded to prepare an affidavit; the affidavit was taken to a State's Attorney who had a bench warrant information typed; the bench warrant was signed by a Judge within the courthouse complex they were in, and a bond of $20,000 was set.

Detective Ambrose executed the warrant at 5:25 P.M. A clerk of the Superior Court was brought into the room at 5:45 P.M. and he advised defendant of certain rights, including the right to "retain" counsel. At 6:00 P.M. defendant was transported back to the State Police Barracks in Bethany for a further polygraph examination in spite of the fact that the

Correctional Institute in Bridgeport was authorized to accept custody of him.

The facts surrounding defendant's evening departure for Bethany are unclear. Detective Ambrose, who was the first witness to testify at the *Huntley* hearing, recounted the following sequence of events: When the clerk of the Superior Court entered the room (at about 5:45 P.M.) defendant stated that he wanted to call his mother. Defendant could not, however, dial the phone because "he started going into tears." Detective Ambrose offered to call for defendant and did so while Detective Solomon and the clerk conversed with defendant. Defendant spoke with his mother, told her that he had been arrested for the burglary of the bowling alley, and again "started to go in tears." At that time Detective Solomon took the phone and notified defendant's mother that defendant would be presented in court the next day and that his bond was $20,000. Thereafter, at 6:00 P.M. the three detectives and defendant departed for Bethany. In the car defendant told them that since they had been treating him so well, he wanted to go back to Bethany to take the polygraph test to prove to his three companions that he was telling the truth. Detective Ambrose reiterated that they were "already on the road to Bethany" when this conversation took place. Ambrose also testified, on cross-examination, that defendant cried again "in the car going up to Bethany". They arrived in Bethany at about 6:35 P.M.

Detective Solomon placed the time of the telephone call to defendant's mother at about 5:00 P.M. He recalled that shortly after 5:00 P.M. he requested that the defendant take another polygraph examination to substantiate his 4:30 story. Defendant consented, stating that it might clear things up and prove to the detective that he was telling the truth. Solomon remembered leaving for Bethany at 6:00 to 6:15 P.M. During the course of the ride defendant told the officers that he knew he was probably going to jail for the burglary but that "when it was over with" the three of them would be "proud" of him. Solomon mentioned stopping at a restaurant before their arrival in Bethany, but defendant declined, stating that "he just wanted to go up there and get the test over with".

There is no question as to what went on in Bethany after their arrival since the entire interrogation, from approximately 7:00 P.M. until 9:20 P.M., was recorded on tape. Sergeant Dewey was left alone with defendant and commenced

his procedure by giving defendant his *Miranda* warnings. He then mentioned that he was there to help defendant, but that the only way he could was if defendant wanted to help himself. He reminded defendant that he had been correct about his lack of truthfulness that morning and told defendant that he wanted to help him more than he had helped him that morning. He told defendant that his polygraph "records your insides and there's * * * no way that you can beat it."

Dewey proceeded to ask defendant about the account he had given at 4:30 P.M. Defendant told him that he had broken in through a sky light at about 10:30 P.M. There was no money in the cash register and nothing in the wall lockers. Defendant then tipped a cigarette machine upside down but recovered only $13 in change; he also took about 100 packs of cigarettes, which he placed in a plastic garbage bag. He then lit up a cigarette before proceeding downstairs to a lower level of the bowling alley. He said his cigarette bumped against a wall but he did not know about it because he had been drinking that night and was high. He was thinking about taking a television which was located right next to the toy bin, but heard noises and left the room. He returned 10 minutes later and thought he smelled smoke—then suddenly he noticed a fire in the toy bin. He was "pretty sure" the lit end of his cigarette had fallen into the bin. He kicked the fire a couple of times, trying to put it out, but got scared, gathered up the cigarettes and a radio, and left the place. Defendant said he left the alleys at about 11:30 P.M., hid the cigarettes in the woods, and went to a bar.

Dewey proceeded to connect defendant to the polygraph and asked him a series of questions. Following the completion of the questions, Dewey left the room to confer with his "partner". He returned in a few minutes and told defendant that he still had not received the truth. There followed a lengthy dialogue with Dewey insisting that defendant had lied and offering again to "help" defendant, and defendant insisting that he had told the truth. Finally defendant asked if he could remove the polygraph attachments. Dewey told him he could but stated that he had noticed through years of experience that "a guilty person doesn't want things attached to him that are calling him a liar". Dewey then said that the truth was known by God, defendant and the polygraph.

This was followed by Dewey's suggestion that defendant might need psychiatric help. Dewey even offered to get a

psychiatrist for defendant and defendant asked him to "set it up". Dewey then backed off this approach and tried again to persuade defendant to tell the truth. Dewey left the room at about 9:00 P.M. and went into his office across the hall.

At that point the three detectives entered. They cross-questioned defendant in higher than normal, almost shouting tones. Ambrose told defendant he was not "fucking around" and ordered defendant to look at him or defendant was going through the window. He threatened to nail defendant to the cross with the 24 victims of the fire, and to "talk to the boss" about defendant's bond. Dewey testified that from his office it sounded at one point as though defendant may have been crying.

Ambrose and Lovallo left the room, leaving Solomon alone with the defendant. Solomon told defendant he had "torched that place—there's no question about it." He told defendant he wanted to know how the "torching" had been done. Defendant told him it was an accident; that he had a match in his hand and dropped it. Solomon asked defendant if he used chemicals; defendant told him there were no chemicals involved. Solomon kept asking defendant what "stuff" was used and finally suggested: "You lit a piece of paper with a match. Can you tell me that? What did you do?" Defendant agreed: "Yea. I lit a piece of paper inside the box." Solomon asked whether there was anything on the paper. Defendant said there was not. Solomon asked defendant why he had done it. Defendant replied: "I don't know. I was really high and stuff like that." Solomon told defendant he personally felt that a solution was used: "Listen, if you're gonna start a fire you don't start it with a piece of paper and a match—not that kind of a fire". Defendant continued to deny that any substance was used. He then denied that any paper was used and said he had accidentally dropped a match.

Ambrose re-entered the room and asked defendant if he lit the match after saturating a cloth with a chemical. Defendant said that he did not even light a match; he said the fire started "just with a cigarette". Ambrose told defendant the polygraph proved he was lying and that Dewey could testify to that in court. Ambrose then said nobody would lodge a murder charge against defendant because defendant intended to burn down the bowling alleys, not Gulliver's. Defendant kept insisting the fire was an accident caused by a cigarette. Ambrose told him that the results of scientific tests, which

would show the use of chemicals, would be available the next day "and they can change the charge and they'll add some charges you know—it's better that we hear it than have to find out the hard way". Ambrose threatened that defendant would end up in Westchester unless he told the truth. Defendant insisted that he had and Ambrose told him that he could "find that chemical" and "bury" defendant to the cross. The tapes conclude with defendant still insisting that the fire started as a result of a cigarette.

At approximately 9:40 P.M. defendant was placed back in Detective Ambrose's car for the ride back to the jail in Bridgeport. Before leaving Bethany, Detective Lovallo informed the defendant that he would seek indictments in New York for the death of the 24 victims. Detective Solomon told defendant that he and his colleagues did not wish to speak to him anymore. According to both Ambrose and Solomon there was complete silence in the car until suddenly defendant stated that he wanted to tell them the truth. Detective Solomon testified that there was a short silence and that defendant spoke up less than a mile down the road. Detective Ambrose recalled that they had been in the car about 15 minutes before defendant broke the silence and that he started to cry again.

According to Solomon defendant told them that he intentionally started the fire in order to cover up for the burglary. Solomon asked him how he had started the fire and defendant replied that he had taken stationery from underneath the front desk of the bowling alleys, stuffed it into the toy box, and set it on fire. Detective Ambrose's recollection differed slightly in that Ambrose testified that defendant said he tried to put the fire out; singed both hands; heard a noise and fled. When asked why he had not come out with the truth sooner, defendant allegedly replied that he thought the detectives would think he had intentionally started the fire to kill the people in Gulliver's. Defendant was not asked how he thought the fire would cover up the burglary and was allegedly told, when he asked to give another "statement", that he could see Detective Solomon the next morning.

Defendant was left at the Correctional Institute in Bridgeport at about 10:25 P.M., shook hands with the three detectives, and told Detective Solomon that he wanted to speak with him in the morning. He did in fact speak to Solomon and that conversation was preserved on tape. Defendant stated

simply that he wanted to tell Solomon that "there was no chemicals or nothing really used in the whole thing." He was then given his *Miranda* warnings and apparently surprised his questioners by requesting the presence of an attorney.[3] One was provided and the interrogation was at an end.

On these facts Criminal Term found that defendant had been treated with "complete courtesy and consideration" by the police officers to whom he gave the statements. It was held that at no time was defendant under any coercion and that all admissions were voluntarily made. This court cannot disagree more, for, as Mr. Chief Justice WARREN eloquently put it, "coercion can be mental as well as physical, and * * * the blood of the accused is not the only hallmark of an unconstitutional inquisition" *(Blackburn v Alabama,* 361 US 199, 206).

At the outset we acknowledge the fact that defendant was frequently, and generally in a timely fashion, given his *Miranda* warnings. Those warnings are, of course, simply a "prerequisite" to the admissibility of any statement made by a defendant *(Miranda v Arizona,* 384 US 436, 476). It is beyond dispute that the giving of the warnings alone is not necessarily sufficient to protect one's privilege against self incrimination (see *Westover v United States,* 384 US 436, 497; see, also, *People v Chapple,* 38 NY2d 112). One could not seriously contend, for example, that a confession which had been beaten out of a man should be admissible by reason of the fact that the letter of the *Miranda* ritual had been complied with. "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond,* 365 U. S. 534. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *(Culombe v Connecticut,* 367 US 568, 602.)

The voluntariness of a confession can only be determined through an examination of the totality of the circumstances

---

3. He was asked, for instance: "Now why do you want a lawyer present right now?" He was then asked if he wanted "a private discussion with some lawyer right now before you talk to us?"

surrounding the confession *(Clewis v Texas,* 386 US 707). Relevant criteria include the duration and conditions of detention, the manifest attitude of the police toward the detainee, the existence of threat or inducement, and the age, physical state and mental state of the detainee *(Culombe v Connecticut, supra,* p 602; *Brown v United States,* 356 F2d 230, 232).

Bearing in mind that much weight must be accorded the determination of Criminal Term, with its peculiar advantages of having seen and heard the witnesses (see *People v Prochilo,* 41 NY2d 759), we simply cannot agree that the People have sustained their burden of proving beyond a reasonable doubt (see *People v Huntley,* 15 NY2d 72, 78) that the admissions and alleged confessions made by defendant during and immediately subsequent to his evening interrogation in Bethany were the product of a free and unfettered will. At least seven major factors may be identified as negating the People's claim of voluntariness.

(1) Defendant's physical and mental condition was obviously such that his faculties were impaired (see *Clewis v Texas,* 386 US 707, *supra).* Defendant had slept only three hours the night before; that morning he was tired and had a headache (in fact he requested that the first polygraph examination be terminated because he felt ill); from 6:00 A.M., when he arose, until nearly 10:30 P.M., when he was finally delivered to the jail, he had eaten only lunch. He was under severe stress, as evidenced by the testimony of Detective Ambrose that he cried when he was arrested, again on the drive up to Bethany, and again when he allegedly confessed on the way back to Bridgeport. The tape recordings further show that defendant cried in Bethany. The record indicates that certainly by 6:00 P.M. on the day in question, the defendant was in a tortured emotional state and weakened physically.

(2) The distance by which defendant was physically separated from his home must also be taken into account. It is manifest that his interrogators wanted him well removed from his familiar surroundings in the Greenwich area. It might appear, in the light of Detective Solomon's prearrangements for a room in Bridgeport, that the "request" that defendant take a polygraph examination was simply a ruse to get him far from home so that more effective interrogation could take place (cf. *Miranda v Arizona,* 384 US 436, 449-450, *supra).* Even assuming that the prearrangement for the room was simply an intelligent precaution for the possibility that

defendant would want to bare his soul, it is significant from the standpoint that the investigating officers intended to conduct further possible questioning at a place well removed from defendant's home.

(3) Defendant's interrogation was both lengthy and intense. Defendant was in the constant company of detectives from 7:00 A.M. until approximately 10:30 P.M. We assume, for the sake of argument, that no interrogation commenced until approximately 10:00 A.M., when defendant was introduced to Sergeant Dewey. He was thereafter questioned for one hour by Dewey; told by both Dewey and Solomon that he was lying, and had his lying "discussed" by Solomon on the return trip. It strains credulity to believe that on an investigation of this nature, all questioning would have ceased until 1:00 P.M. upon defendant's admission that he had burglarized Carol Lanes. In any event defendant was interrogated intermittently throughout the entire afternoon and was repeatedly told that "the professionals" could not accept his version of the facts. He was then interrogated throughout much of the evening and was again repeatedly told that he was lying and that he had indeed "torched that place". Thus we find that defendant was interrogated intermittently, but very intensively, over a period of more than 12 hours (cf. *Thomas v State of North Carolina,* 447 F2d 1320 [15-year-old of low mentality and limited education interrogated for 19 hours and told it would be better to confess]).

(4) Although the investigating officers were in technical compliance with the State of Connecticut's arraignment statute (Conn Gen State, § 54-43), the facts suggest that arraignment was indeed delayed. In view of the content of defendant's 1:45 P.M. statement and the nature of the investigation, it is beyond belief that he was free to leave the questioning officers after that time. Nevertheless no formal arrest was made until after 5:00 P.M. Furthermore, although a Judge was available to sign the bench warrant and set a bond, no attempt was made to have defendant arraigned after execution of the warrant. While certainly not dispositive of this case, the foregoing facts suggest a rather zealous interest in maintaining "control" of defendant until a confession could be obtained.

(5) The use of a polygraph will not, in and of itself, render a confession inadmissible as the product of coercion *(People v Wilson,* 78 Misc 2d 468, 474, affd 47 AD2d 671). However, the

use or misuse of a polygraphic examination is certainly a factor to be considered in determining whether there was impermissible coercion *(People v Wilson, supra,* pp 474-475). In the instant case the evening examination was misused as a sophisticated tool for attempting to extract a confession. The examiner was there to "help" the defendant (cf. *Leyra v Denno,* 347 US 556); he even offered to get psychiatric help for this defendant, who had admittedly seen a psychiatrist before; his machine was infallible and knew the truth just like defendant and God; only the guilty want the polygraph attachments removed. The psychologically coercive effect of this kind of interrogation—especially in view of defendant's physical and mental condition, and in the light of the intensive interrogation which preceded it[4] is to be condemned (cf. *People v Zimmer,* 68 Misc 2d 1067, affd 40 AD2d 955). The coercive nature of the testing was compounded by Detective Ambrose's deception in telling defendant that the polygraph proved he was lying and that Dewey could testify to that in court. Of course, no such evidence is admissible in this State (see *People v Leone,* 25 NY2d 511).

(6) The false statements and threats also served to overbear defendant's will and impair his capacity for self-determination. Detective Ambrose's threat to throw the defendant through a window was hardly the courteous treatment described by Criminal Term. Had such a threat been directed at defendant for a failure to speak, it is quite clear that his constitutional right to remain silent would have been transgressed. It is even more onerous to find a prisoner threatened with such violence if he so much as fails to *look* at his interrogator.

In addition there were the threats to raise bail and to ship defendant to New York State. These were, of course, balanced by the promise that nobody would lodge a murder charge against defendant—all he had to do was to tell them what they wanted to hear from him. All he had to say was that he used certain chemicals to "torch" the bowling alleys.

(7) Perhaps most disturbing about the evening interrogation was the suggestiveness of the questioning. For example, the so-called admission (the one recorded on tape) about lighting a piece of paper with a match was made only after the most

---

4. Sergeant Dewey testified that the accuracy of polygraphic examination results can be affected by excessive fatigue, prolonged interrogation, the use of drugs and a number of other factors, including the voluntary submission of the subject to the test.

intensive questioning, and only after Detective Solomon had told defendant: "You lit a piece of paper with a match." Defendant simply agreed and more or less parroted what he had been told to say. This "admission" is not only inadmissible; it is inherently unreliable as well.[5]

We would add that in applying the "totality of the circumstances" test, which we have utilized in this case, we find that only those admissions made *after* 6:00 P.M. on the evening of July 11, 1974 were involuntarily made. These would include any admissions recorded at Bethany that evening and the alleged confession on the way back from Bethany. The statement made on the morning of July 12, 1974, to the effect that there were "no chemicals or nothing really used in the whole thing", was sufficiently removed in time and place from the interrogation of the previous evening so that it is admissible (cf. *People v Glover,* 58 AD2d 814).

In view of our disposition of this case we do not reach defendant's argument that a hearing should have been held with reference to his application, at sentencing, to withdraw his plea on the grounds that he had been sedated and was, in fact, innocent.

Finally, there is no merit to the People's position that even before his arrest, the defendant had confessed to felony-murder (the underlying felony being burglary). Having confessed to only an accidental starting of the fire, defendant had not admitted causing deaths "in the course of and in furtherance of [the burglary] or of immediate flight therefrom" (Penal Law, § 125.25, subd 3). Nor is there any merit to the People's claim that at trial they could have proven intent by showing that an accelerant was used. The issue on this appeal is not whether defendant would have been convicted anyway, but whether his statements were involuntarily made.[6]

HOPKINS, J. P., MARTUSCELLO and O'Connor, JJ., concur.

Judgment of the Supreme Court, Westchester County, rendered July 16, 1975, reversed, on the law and the facts, plea of

---

5. See Driver, Confessions and The Social Psychology of Coercion (82 Harv L Rev 42, 51 [1968]): "Social-psychological data suggest that a suspect—even an innocent suspect—while isolated physically and socially from the groups which usually validate his ideas may well change his stated beliefs in the fact of contradictory assertions of 'fact,' emotional inducements, and the possibility of gaining social acceptance."

6. Additionally, there is nothing in the record to indicate the presence of an accelerant at the source of the fire.

guilty vacated, and motion to suppress statements made by defendant granted to the extent that all statements made by him on July 11, 1974, subsequent to 6:00 P.M., are suppressed.