■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SHERYL SOHN, Appellant.—Appeal by the defendant from a judgment of the County Court, Rockland County, (Miller, J.), rendered November 18, 1981, convicting her of murder in the second degree (two counts), robbery in the first degree (two

counts), robbery in the second degree, burglary in the first degree (two counts), and grand larceny in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing (Gallucci, J.), of that branch of the defendant's omnibus motion which was to suppress statements made by her to law enforcement authorities.

Ordered that the judgment is affirmed.

The defendant Sheryl Sohn's parents were found dead in their home at 38 Jill Lane, Spring Valley, on December 28, 1980. Detective Clifford Tallman of the Spring Valley Police Department was assigned to investigate the murders. On that same day at about 3:30 P.M., he spoke to the defendant in the detective room at the police station concerning her whereabouts the previous night. The defendant had gone voluntarily to the police station at the request of the police and was not a suspect, and therefore, she was not advised of her *Miranda* rights. The conversation lasted about 15 minutes and the defendant essentially told the detective that she had spent the night with a friend of hers by the name of Jody Stich. At the conclusion of the interview the defendant left the police station.

On December 29, 1980, Detective Tallman, accompanied by Detective Edwin O'Neill, went to see the defendant at a neighbor's house and asked if she would accompany them back to the police station to speak further. She agreed and the three of them entered the police car which was parked outside. Detective Tallman orally advised the defendant of her *Miranda* rights and the defendant stated she understood them. The defendant then consented to take a polygraph examination at the State Police Barracks in Middletown, where they arrived at 1:30 P.M.

The defendant was taken into an interview room where she met Investigator Jeremiah O'Leary of the State Police, who was the polygraphist who would administer the polygraph test. Investigator O'Leary gave the defendant some written materials pertaining to the polygraph, a notice advising her that she did not have to take the test, and a polygraph examination agreement and release form which advised her of her *Miranda* rights. Approximately 10 minutes later, after she had an opportunity to review the written materials, she was escorted to the polygraph room.

Once in the polygraph room, the defendant was informed by O'Leary that she was free to leave at any time, even in the

middle of the test. He then further explained her rights to her and told her that the results of the polygraph test would not be admissible in court unless all of the parties agreed that they would be admissible. He asked her if anyone had forced her to take the test, and she responded "no, they hadn't". O'Leary also asked her if she wanted a lawyer and she responded, "No, I'm telling the truth. I don't want a lawyer". The defendant then signed the first half of the release form consenting to the polygraph interview.

Thereafter, the defendant was given the polygraph sensitivity test and the test itself. After the test O'Leary told her that in his opinion she "wasn't telling the entire truth". He did not tell her, however, that the test itself had been inconclusive, and that his opinion had been based on the totality of his contact with her, including the pretest interview. Initially, she said that she was telling the truth and denied all knowledge of the murders. Eventually, however, she told O'Leary that she knew who murdered her parents and then proceeded to make inculpatory statements implicating herself and others. The defendant was lucid and cooperative during the questioning and did not give any indication at any point that she wanted to leave. The entire polygraph test was viewed and heard by Detectives Tallman and O'Neill from an adjoining room.

The test was completed at about 5:15 P.M. at which time the defendant signed the bottom of the release form reaffirming that she had taken the test freely and voluntarily and had waived all her rights.

The defendant was asked if she would be willing to give a written statement to the detectives and she agreed. A written statement was thereafter typed and signed by her. The defendant then made additional oral statements as they were leaving the police barracks and also in the police car on the way back to Spring Valley. She was dropped off at the Stich residence at 8:00 P.M. and was not arrested until January 14, 1981.

The defendant challenges the hearing court's determination not to suppress the statements made by her to the police, claiming that the court erred in finding that she was not in custody when she made the statements and that the totality of the circumstances reveal that her statements were coerced and not the product of her own free will. We disagree.

That the defendant was advised of her *Miranda* rights prior to submitting to and during the polygraph examination, ap-

parently out of an "excess of caution" on the part of the police (People v Smith, 62 NY2d 306, 312, n 2), does not preclude a finding that she was not in custody (see, People v Ross, 134 AD2d 298, lv denied 70 NY2d 937, on reconsideration lv denied 72 NY2d 866; see also, People v Dyla, 142 AD2d 423). Rather, the issuance of the warnings negated any possibility that the defendant felt compelled to submit to the polygraph test or speak to the detectives (see, People v Ross, supra; People v Oates, 104 AD2d 907, 911; People v Tarsia, 67 AD2d 210, affd 50 NY2d 1). Clearly, under the circumstances of this case, where the defendant was released after giving her statements, the hearing court was correct in finding that she was not in custody when she gave them.

As to the voluntariness of her confession, that is to "be determined through an examination of the totality of the circumstances surrounding the confession" (People v Leonard, 59 AD2d 1, 12-13). "The use of a polygraph will not, in and of itself, render a confession inadmissible as the product of coercion * * *. However, the use or misuse of a polygraph examination is certainly a factor to be considered in determining whether there was impermissible coercion" (People v Leonard, supra, at 14-15).

While it could be argued that some measure of guile was employed by Investigator O'Leary, when he told the defendant that in his opinion she wasn't being completely truthful, without explaining to her that the test results were inconclusive, such a stratagem "need not result in involuntariness without some showing that the deception was so fundamentally unfair as to deny due process * * * or that a promise or threat was made that could induce a false confession" (see, People v Tarsia, 50 NY2d 1, 11, supra; People v Henry, 132 AD2d 673, 675). We conclude that the conduct on the part of the law enforcement officials herein was not so fundamentally unfair as to deny due process (see, People v Henry, supra).

Moreover, an examination of the circumstances surrounding the confession, i.e, "the duration and conditions of detention, the manifest attitude of the police toward the detainee, the existence of threat or inducement, and the age, physical state and mental state of the detainee" (People v Leonard, supra, at 13), provides ample support for the hearing court's determination that the defendant's statements were voluntary. This 23-year-old woman neither complained of fatigue nor requested any food, nor was she subjected to any coercive tactics; she chose to waive her rights after being advised of them several times and specifically stated that no one had forced her to

take the polygraph test. Thus, the record amply supports the hearing court's conclusion that the defendant's statements were voluntary.

We have examined the defendant's remaining contentions and find them to be either unpreserved for appellate review or without merit. Thompson, J. P., Lawrence, Kunzeman and Rubin, JJ., concur.