■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ZOCKER KOURANI, Also Known as ARTURO ROMERO, Appellant. [683 NYS2d 570] —Appeal by the defendant from a judgment of the Supreme Court, Queens County (Lewis, J.), rendered October 9, 1997, convicting him of robbery in the first degree, burglary in the first degree, and endangering the welfare of a child (three counts), upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress a statement made by him to law enforcement officials.

Ordered that the judgment is affirmed.

At the suppression hearing, the investigating detectives testified that the defendant agreed to accompany them to the police precinct house to assist them in their investigation of the robbery of the defendant's brother and his family. The detectives

did not tell the defendant that he was a suspect in the investigation at that time. At the defendant's suggestion, they took his car so that he could drive home when they were finished. As a safety precaution, one of the detectives searched the defendant before they got into the car, but the defendant was not handcuffed.

At the precinct house, one of the detectives told the defendant that he was a suspect in the case. The detectives allowed the defendant to use the restroom as needed, drink water, and make phone calls. The detectives offered the defendant food, but he declined the offer. The detectives permitted the defendant to telephone his brother, but did not themselves have any conversation of substance with the brother. Approximately seven and three-quarter hours after the detectives arrived at the precinct with the defendant, one of the detectives read the defendant his Fifth Amendment rights in Spanish. The defendant then confessed to participating in the robbery of his brother's house.

The hearing court found that the defendant was not in custody at the time he made his statement to the police. The court also found that the statement was freely, knowingly, and voluntarily made after the defendant was informed of his Fifth Amendment rights. The court expressly credited the testimony of the detectives, and discredited the testimony of the defendant and his brother. The court's findings of fact are supported by the hearing record, and we do not find it appropriate to make new findings (*see, People v Tankleff,* 199 AD2d 550, *affd* 84 NY2d 992; *People v Johnson,* 160 AD2d 813, 814). Based upon those findings of fact, the hearing court properly refused to suppress the statement (*see, People v Thomas,* 223 AD2d 612; *People v Sohn,* 148 AD2d 553).

Viewing the evidence in the light most favorable to the prosecution (*see, People v Contes,* 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence (*see,* CPL 470.15 [5]).

We find no merit to the defendant's contention that the trial court erred in denying his objection to the prosecution's exercise of peremptory challenges. The record of the voir dire indicates that the trial court denied the defendant's objection based on the court's determination that the defendant failed to demonstrate prima facie that the prosecution exercised its challenges with a discriminatory purpose (*see, Batson v Kentucky,* 476 US 79, 96; *People v Kern,* 75 NY2d 638, *cert denied*

498 US 824). Upon our review of the record, we agree with the trial court's determination that the pattern of the prosecution's challenges was insufficient to support the defendant's objection (*see, People v Steele,* 79 NY2d 317; *People v Vidal,* 212 AD2d 553).

The defendant's contention that he was denied the right to confrontation is unpreserved for review (*see,* CPL 470.05 [2]; *People v Russell,* 71 NY2d 1016), as is his claim that Detective Siraco's testimony regarding eyewitness descriptions of the robbers was admissible to rebut a claim of recent fabrication. In any event, with regard to the confrontation issue, it was counsel for the defendant who elicited testimony regarding the out-of-court statement of a codefendant (*see, Bruton v United States,* 391 US 123). As to Detective Siraco's testimony, the prosecution never advanced a theory of recent fabrication.

The defendant did not object to the prosecution's cross-examination of his alibi witnesses with regard to their failure to come forward with information favorable to the defendant (*see, People v Miller,* 89 NY2d 1077; *People v Dawson,* 50 NY2d 311). In light of the gap of more than three months between the defendant's arrest and defense counsel's request that the witnesses refrain from speaking to the police, the trial court correctly instructed the jury with regard to the significance of the witnesses' failure to come forward prior to defense counsel's request (*see, People v Miller, supra*).

Moreover, the defendant's request for a missing witness charge, made after both sides had rested their respective cases, was untimely (*see, People v Woodford,* 200 AD2d 644; *People v Catoe,* 181 AD2d 905; *People v Randall,* 177 AD2d 581).

The defendant's sentence was not excessive (*see, People v Suitte,* 90 AD2d 80).

The defendant's remaining contentions, including the claims of prosecutorial misconduct, are either unpreserved for appellate review or without merit. Coopertino, Thompson and Sullivan, JJ., concur.

Friedmann, J., dissents and votes to reverse the judgment, grant that branch of the defendant's omnibus motion which was to suppress a statement made by him to law enforcement officials, and order a new trial, with the following memorandum in which Miller, J. P., concurs: The defendant is linked to the instant crime only by a statement he made to police which he claims was false and coerced, and by the identification of a confessed participant, Duarte Rosario, who did not testify at trial. Because the hearing record makes clear that the defendant was subjected to a custodial interrogation at the police

station for approximately eight hours before he was read his *Miranda* warnings, I am persuaded that the resulting statement was involuntarily obtained and should have been suppressed. Moreover, the prosecution's indirect use of confessed participant Duarte Rosario's identification of the defendant constituted a violation of the defendant's constitutional right to confront the witnesses against him, and was so prejudicial that it should be reached in the exercise of our interest of justice jurisdiction. Finally, several additional trial errors contributed to the defendant's conviction and provide independent grounds for reversal.

### FACTS

At about 8:30 on the evening of April 7, 1996, three men burglarized the home of Ibrahim Kourani, the defendant's older brother. Over roughly an hour and a half, the trio held five adults and four children hostage at gunpoint, and eventually left with some $2,000 to $3,000 in cash and jewelry. One of the robbers wore nothing over his face, while another (Duarte Rosario) had covered his visage with a light stocking which did not really hide his features. The third burglar was tall and thin, was dressed all in black, and had effectively concealed his features behind a dark stocking-mask. It is not disputed that the defendant is 5 feet 4 inches, and that none of the victims of the crime (including the defendant's own brother and sister-in-law) identified him as one of the perpetrators or described anyone resembling him to the police. In addition, the defendant's confession was written in English, which the defendant scarcely spoke and could not read, and it contained no acknowledgment by the defendant that its contents had been read to him.

*The suppression hearing:*

The evidence at the *Huntley* hearing established that the fingerprint of Duarte Rosario was found on a cash box in Ibrahim Kourani's burglarized house. Rosario was picked up and interviewed by Detectives Arthur Hearns and Ivan Burbon. Ibrahim Kourani and his wife Martha identified a so-called "mugshot" of Rosario, and then picked him out of a lineup. According to Martha, Rosario was "the nasty one", "the guy who had the gun". Ultimately, Rosario told Detective Burbon in Spanish that the defendant, Ibrahim Kourani's brother, had designed and participated in the crime.

Ibrahim and the defendant operated separate men's clothing stores just a few doors from each other in upper Manhattan. Sponsored by his older brother Ibrahim, the defendant, 23

years old at the time of trial, had arrived in this country from Lebanon in 1992, by way of Uruguay, Colombia, and Brazil. Besides Arabic, the defendant spoke Spanish fluently, but only "some" English, and he claimed to be unable to read or write either Spanish or English. He had adopted what he referred to as the Hispanic name of Arturo Romero to better fit into the neighborhood where his business was located.

Some time after 6:30 P.M. on the evening of April 17, 1996, Detectives Hearns and Burbon and two other police officers arrived at the defendant's store and asked him to accompany them to the police station to help them in their investigation into his brother's robbery. According to Detective Hearns' own hearing testimony, upon entering the store, he immediately told the defendant that the defendant had been identified as a participant in the crime, and "that he was a suspect in this case". The Detective asked the defendant if there was "anything he would like to talk to me about". Hearns admitted that he searched the defendant in his shop.

Although the defendant denied any involvement in the crime, he agreed to accompany the police to the precinct house, where they arrived at about 8:00 P.M. Once in the squad room, both detectives testified that they again confronted the defendant with Rosario's accusation, and that they then proceeded to question him about the robbery. When the defendant persisted in his denials, Detective Hearns told him that the police had found his fingerprints in his brother's home. This would not have been surprising, as the defendant was a frequent visitor there. However, it subsequently emerged at the hearing that no fingerprints matching the defendant's were in fact recovered from the scene. Detective Hearns conceded that he "might" have falsely told the defendant that the police had a videotape of him committing the robbery. The officers did not deny that the defendant was given nothing to eat throughout the night.

Both detectives denied arranging a confrontation between the defendant and the jailed Rosario, but they admitted that the defendant spoke with Rosario, who was being detained in a nearby holding cell. According to Detective Hearns, Rosario "walked by" the defendant as the police were conducting the latter "into another interrogation room". In Detective Burbon's account, as he escorted the defendant from the interrogation room to the water fountain, they passed "the cell area" where Rosario was being held, and the two suspects spoke to one another. At the least, this testimony makes clear that the defendant could not have believed that he was free to leave the police station, because he was accompanied by police officers whenever he left the interrogation room.

Ibrahim Kourani testified at the hearing, in broken English and through an Arabic interpreter, that he had gone to the police station to visit his brother on the evening of the arrest, but was turned away by Detective Hearns. However, in the middle of the night, between 2:00 and 3:00 A.M., Detective Hearns telephoned Ibrahim twice to ask him to "translate" the officer's requests into Arabic for the defendant. Although Ibrahim did not understand everything that Hearns said, he ultimately urged his brother over the telephone to "sign the paper" that the police were pressing upon him so that he could "come out the jail". Hearns did not explain to Ibrahim what was on these "papers". Detective Hearns admitted talking to Ibrahim, but he could not recall the substance of their conversation. It was his best recollection that he merely dialed the telephone to enable the defendant to converse with Ibrahim, but that he had no idea what the brothers discussed in their native tongue.

At a few minutes before 4:00 A.M., while Detective Hearns was out of the room, Detective Burbon, speaking in Spanish, read the defendant his *Miranda* rights for the first time. Immediately thereafter the defendant allegedly confessed that he had participated in the robbery of Ibrahim's house, to "get even" with his brother because of an ill-defined business disagreement the two had had over merchandise pricing. Burbon wrote the defendant's statement down in English—although he testified that he "read it" aloud to the defendant "in Spanish and in English" before having the defendant affix his signature at 4:15 A.M. Burbon then placed the defendant under arrest.

Relying upon the testimony of Detectives Hearns and Burbon, the hearing court found that the defendant's statement was admissible because he was not in custody when he made it, and because the defendant had not been mistreated by the police. In the alternative, the court ruled that even if the defendant was in custody when he spoke, his statement had been lawfully obtained because he had first been given his *Miranda* warnings.

Although ordinarily a hearing court's findings of fact are entitled to great deference, no such deference is warranted where, as here, its findings are contradicted by the very testimony purportedly relied upon (*see, e.g., People v Johnson,* 160 AD2d 813, 814). Under the totality of the above-described circumstances, a reasonable person in the defendant's position, innocent of any crime, would have considered himself to be in custody (*see, e.g., People v Centano,* 76 NY2d 837; *People v Yukl,* 25 NY2d 585, *cert denied* 400 US 851; *People v Bailey,* 140 AD2d 356). The defendant should therefore have been

given his *Miranda* warnings at the outset. Here, the defendant was only perfunctorily advised of his constitutional rights after his will had been overborne by trickery, threats, and false promises (*see, e.g., Culombe v Connecticut,* 367 US 568, 602; *People v Anderson,* 42 NY2d 35, 41; *cf., People v Woods,* 141 AD2d 588, 589). The belated issuance of *Miranda* warnings could not undo the coercive effect of eight hours of nocturnal grilling by the police (*see, e.g., United States v Anderson,* 929 F2d 96, 102; *Quartararo v Mantello,* 715 F Supp 449, *affd* 888 F2d 126). Accordingly, the defendant's statement was improperly obtained and should have been suppressed (*see, e.g., Reck v Pate,* 367 US 433; *see also, Escobedo v Illinois,* 378 US 478; *Tankleff v Senkowski,* 135 F3d 235; *People v Chapple,* 38 NY2d 112, 115; *People v Leonard,* 59 AD2d 1).

It is worthy of note that the defendant's related contention that he was coerced by the above-described tactics into making a false confession is supported by the substantial discrepancies between his statement as written down in English by Detective Burbon and the account of the crime given at trial by Martha Kourani. Martha Kourani, the prosecution's only victim-witness, testified frankly that she did not have a good relationship with the defendant, and that the robber in black "could have been anyone". In Martha Kourani's version, all three robbers spent an hour and a half inside her house, waving guns, moving their hostages around, having temper tantrums, menacing the victims, ripping out the telephones, and generally destroying the premises when they could not locate the quantity of money and valuables that they had hoped to find. At length the trio made off with some jewelry and $1,350 in cash.

In contrast, according to the defendant's confession, the defendant, Rosario, and someone named Carlos went to Ibrahim's house by cab and, while the defendant stood guard outside and Rosario remained posted at the door, Carlos went inside "with a mask and a gun", emerging soon afterwards with $3,000. The trio split the take equally, and then shared another livery cab to their respective homes, dropping off first the defendant, then Rosario, and finally Carlos. It is not clear how the defendant knew this sequence of stops if he was dropped off first.

*The trial:*

Reversal of the defendant's conviction is also warranted because of several trial errors.

Duarte Rosario had received a favorable disposition of the charges against him by pleading guilty and incriminating the

defendant. However, although the prosecutor announced her intention to call Rosario as a witness, Rosario, who was apparently in a Federal prison on an unrelated crime, never testified. Rather, Rosario's accusation was placed before the jury by indirection. That is, Martha Kourani testified that she identified Rosario in a lineup and, immediately afterwards, Detective Burbon testified that following his arrest and interview of Rosario, he and other officers picked up the defendant as the next "subject in [their] investigation". This identification by insinuation constituted an unjustifiable circumvention of the rule prohibiting the admission into evidence of a nontestifying codefendant's confession (*Bruton v United States,* 391 US 123; *see also, Cruz v New York,* 481 US 186; *Mitchell v Hoke,* 745 F Supp 874, *affd* 930 F2d 1; *People v Manuel,* 182 AD2d 711, 712; *People v Tufano,* 69 AD2d 826, 827). Even though counsel did not expressly object to Rosario's absence on *Bruton* grounds, in my opinion the violation is so fundamental that it should be reached in the exercise of our interest of justice jurisdiction.

Contrary to the People's assertion on appeal, defense counsel did not "open the door" to this testimony. Rather, as counsel was cross-examining Martha Kourani about her failure to identify her brother-in-law to the police as one of the three perpetrators, the witness unexpectedly volunteered that she *had* identified *someone* at a lineup. Defense counsel dropped the matter, but immediately thereafter the prosecutor elicited on redirect examination that the person whom Mrs. Kourani had identified in the lineup was Duarte Rosario—even supplying the codefendant's name when the witness could not remember it. During the defense case, the prosecutor vigorously cross-examined both the defendant and his brother Ibrahim regarding the defendant's alleged friendship with Duarte Rosario, whom she described as always being in the defendant's store, hanging about with the defendant's Hispanic girlfriend and her brother, both of whom the defendant employed but whom Ibrahim openly disliked and suspected of theft.

Other errors warranting reversal of the instant conviction included the following:

Police Officer Siraco, who had arrived on the crime scene within a half hour of its commission, took statements from all of the victims, including descriptions of the three perpetrators. The People do not seriously dispute that none of these descriptions matched the defendant. Notably, the burglar in black, who the defendant was alleged to have been, was described at trial by Mrs. Kourani as a good foot taller than defense counsel. Although defense counsel's height does not appear upon the

record, it seems unlikely that he was 4 feet 4 inches tall. The court, however, sustained the prosecutor's objection to Siraco's testimony regarding the descriptions he received from the victims on the ground that it would be hearsay. This was error, as the evidence was arguably admissible under at least one hearsay exception, namely, to rebut the People's theory of recent fabrication by the Kourani family (*see, e.g., People v Yarbough,* 229 AD2d 605; *People v Mieles,* 226 AD2d 397).

In addition, the court refused to issue a missing witness charge with respect to both Rosario and Detective Hearns. These two witnesses were knowledgeable about material issues in the case, would naturally be expected to provide noncumulative testimony favorable to the prosecution, and were under the prosecution's control (*People v Kitching,* 78 NY2d 532, 536; *see also, People v Vasquez,* 76 NY2d 722; *People v Gonzalez,* 68 NY2d 424, 427; *People v Rodriguez,* 38 NY2d 95, 100). Significantly, Detective Hearns, who was in charge of the instant investigation, had spent considerable time alone with the defendant, and had allegedly spoken to his brother Ibrahim by telephone while Detective Burbon was out of the room. Rosario, meanwhile, had received an advantageous plea bargain on this case, and was confined to a Federal penitentiary on an unrelated matter (*see, People v Rodriguez, supra; People v Smith,* 225 AD2d 1030; *Matter of Ismael S.,* 213 AD2d 169, 173). Perhaps because the court agreed with the defendant's contention that the prosecution's witness list had been "changing on a daily basis", it expressly rejected the prosecutor's argument that the defendant's request was untimely. Instead, it erroneously denied the missing witness charge with respect to Detective Hearns on the substantive ground that his testimony would have been cumulative to that of Detective Burbon (*see, e.g., People v Gonzalez,* 68 NY2d 424, 427-428). The court did not explain its denial of a missing witness charge with respect to Rosario.

However, the court *did* grant the prosecutor's improper application for a *Dawson* charge (*People v Dawson,* 50 NY2d 311). Hussein and Juana Kourani, the defendant's brother and sister-in-law with whom he lived, testified at trial that the defendant had been at home with them at the time the robbery was being committed. This account was verified by Ibrahim, who testified that Hussein *and the defendant* hurried from their home to his side when Martha telephoned them within minutes after the crime. Defense counsel presented evidence that he had asked these alibi witnesses not to speak to the police, but to save their testimony for trial. Although the prosecu-

tor did not counter the defendant's demonstration that a *Dawson* charge was inappropriate under the circumstances, the court gave the charge anyway (*see, People v Dawson, supra,* at 323; *People v King,* 200 AD2d 765; *People v Torres,* 111 AD2d 885, 886).

In addition to the foregoing, the defendant was prejudiced by numerous instances of misconduct on the part of the prosecutor. Among other things, the prosecutor mischaracterized Ibrahim's hearing testimony during her cross-examination of him at trial (*see, People v Carborano,* 301 NY 39); proposed to the jury on summation that the defendant had summoned a get-away taxi by means of a cellular phone, of which there was no evidence in the record (*see, People v Solomon,* 70 AD2d 516); and suggested to the jury that it was obliged to find that the defendant had been properly given his *Miranda* warnings prior to giving his statement because the Judge had already determined that issue at a hearing (*see, People v Murray,* 130 AD2d 773, 775; *People v Cornell,* 28 AD2d 1166).

Accordingly, because in my opinion the cumulative effect of all of the foregoing errors deprived the defendant of a fair trial, I would reverse the defendant's convictions, suppress his confession, and order a new trial.