THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
WILLIE DYLA, Appellant.

Second Department, December 30, 1988

### APPEARANCES OF COUNSEL

*Andrew F. Plasse* for appellant, and appellant *pro se.*

*Denis Dillon, District Attorney (Anthony J. Girese* and *Bruce E. Whitney* of counsel), for respondent.

### OPINION OF THE COURT

BRACKEN, J.

The defendant, Willie Dyla, committed a murder while released from prison on parole. He now claims that the confession that he made to Nassau County homicide detectives must be suppressed because it was preceded by an illegal arrest. We hold that the arrest of Dyla by a parole officer was based upon probable cause to believe that Dyla had violated certain conditions of parole, and that even if the arrest must be considered illegal because no parole violation warrant had been issued *(see,* Executive Law § 259-i [3] [a] [i]; 9 NYCRR 8004.2), it did not amount to an unreasonable seizure and did not violate any of Dyla's constitutional rights, so that exclusion of the confession is not an appropriate remedy. We also find that, even assuming that the illegality of the arrest was

of such a magnitude as to warrant the application of the exclusionary rule, any taint caused by the arrest had dissipated prior to Dyla's confession. The County Court was therefore correct in denying Dyla's motion to suppress. There being no merit to the remainder of Dyla's contentions, the judgment of conviction should be affirmed.

## I

After a trial by jury, at which his confession to police was admitted into evidence against him, Dyla was found guilty of the murder of Valerie Abney. The victim died as the result of asphyxiation due to strangulation on March 28, 1982. The evidence adduced at trial established beyond any reasonable doubt that during the course of his burglary of the victim's apartment Dyla caused the victim's death by gagging her and placing a belt around her neck.

Detectives Gary Abbondandelo and Robert Dempsey, both members of the Nassau County Homicide Squad, were assigned to conduct an investigation shortly after the discovery of the victim's body on March 29, 1982. Abbondandelo learned from another detective that Dyla was known to have been a friend of the victim. On March 31 Abbondandelo went to 46 Elm Avenue, Dyla's residence, and left his card with one of Dyla's neighbors. At 9:25 a.m. the following day, April 1, Dyla telephoned Detective Abbondandelo and agreed to meet with him at police headquarters in Mineola on April 2. However, Dyla failed to keep that appointment.

Further investigation revealed that Dyla had been on parole at the time of the murder. On April 2, 1982, Detective-Sergeant Kenney informed Dyla's parole officer, Robert Burford, that Dyla was wanted for questioning in connection with a homicide investigation, and that Dyla had been contacted by Abbondandelo on April 1. Dyla's failure to inform Burford of this contact constituted a violation of one of the conditions of his parole.

Detective Dempsey met with Burford on April 3 and informed Burford that the police had been unsuccessful in locating Dyla at 46 Elm Street, his last known address. The police had learned from Dyla's former paramour that Dyla had left that address, and that his whereabouts were unknown. On April 7, Dyla's mother was contacted and stated that she, too, was unaware of Dyla's whereabouts.

On April 8, Dyla telephoned Burford and informed him that

he had entered a residential drug program in New York City. Dyla was instructed to report to the parole office in Hempstead on April 12. Burford then informed Lieutenant Spillane of the Nassau County Homicide Squad that Dyla was due to report to the parole office in Hempstead on April 12.

Dyla arrived at the parole office in the company of a companion at 10:15 A.M. on April 12. Burford interviewed Dyla for several minutes concerning his change of address and change in drug treatment programs. After it became apparent that Dyla was persisting in his failure to admit that he had had contact with the police, Burford decided to arrest him for a violation of parole. Dyla was then handcuffed to a chair. It is clear that Burford had not, as of that time, obtained a parole violation warrant.

Detectives Abbondandelo and Dempsey arrived at Burford's office at approximately 11:00 A.M. The handcuffs were removed as soon as the detectives arrived, although it is not clear whether Abbondandelo asked Burford to remove them. Abbondandelo informed both Dyla and Burford that Dyla was not being placed under arrest for the homicide. However, Dyla was requested to accompany the detectives to police headquarters in Mineola for questioning. Dyla agreed to go, and his companion was allowed to accompany them. It is important to note that Burford testified that he would not have allowed Dyla to leave his office if Dyla had refused to cooperate with the police.

At police headquarters, Dyla was questioned about the Abney homicide, and initially gave an exculpatory account of his whereabouts on March 28. Dyla then agreed to take a polygraph test. At approximately 12:50 P.M. Dyla was introduced to Detective Sergeant Edward Goutink, the polygraph examiner, who informed Dyla of his *Miranda* rights, and who also told Dyla that the results of the polygraph test were not admissible as evidence. Goutink emphasized, however, that any incriminating statements made during the test could be admitted into evidence. Dyla submitted to the polygraph test after a knowing and voluntary waiver of his rights.

At the conclusion of the test, Detective Goutink informed Dyla that he "was absolutely convinced after analyzing the charts that he had lied * * * and that, in fact, he had killed Valerie Abney". Goutink then engaged Dyla in an hour-long conversation which centered on the beneficial consequences that flow from one's confrontation with and admission of guilt.

At approximately 5:00 P.M., Detectives Abbondandelo and Dempsey were informed by Goutink that Dyla had failed the polygraph test. Dyla was then taken back to the Homicide Squad office. Dyla was again read his *Miranda* rights, which he again waived. Abbondandelo reminded Dyla that he had failed the polygraph and that Goutink's opinion was that he was involved in the murder of Valerie Abney. The two detectives then resumed their questioning of the defendant.

During this portion of the interrogation, Abbondandelo discussed Dyla's "drug problem" with him. Dempsey then began to talk about Dyla's "family problems", with Dyla keeping his head down and looking at the floor. Dempsey then asked Dyla to look into his eyes, and, at approximately 6:25 P.M., Dyla raised his head, began to sob, and said "yes, man, I did it, I killed her".

## II

After having made subsequent and more elaborate confessions, both oral and in writing, Dyla was formally arrested and charged with the murder of Valerie Abney. He was later indicted by a Nassau County Grand Jury for murder in the second degree (three counts), robbery in the first degree, and burglary in the first degree.

Dyla made several pretrial motions, two of which (a motion dated July 13, 1982, and a *pro se* motion dated May 2, 1982) contained applications for the suppression of his statements to police. It was argued in the affidavits supporting these motions that "Dyla was arrested without probable cause and that any statements and evidence [obtained] subsequent to this improper arrest must be suppressed".

After a pretrial hearing, the County Court, in a decision entered February 2, 1984, denied Dyla's motions for the suppression of the statements. In its decision, the County Court found, among other things, that when Parole Officer Burford handcuffed Dyla to the chair in the parole office on April 12, 1982, he had not as yet made a decision as to whether to revoke Dyla's parole.[1] The court found that it was

---

1. We disagree with this particular finding of fact. The record of Officer Burford's testimony indicates that at the time that he handcuffed Dyla he *had* decided to initiate parole revocation procedures. Our finding in this regard bolsters the conclusion reached by the court that Parole Officer Burford was not acting as an agent for the police, but was working independently. We also infer that, had Burford not shortly thereafter agreed

for this reason that no parole violation warrant had been obtained. The court further concluded that, although Dyla had been placed in custody when he was handcuffed (cf., *People v Tirado,* 69 NY2d 863, *on remand* 117 AD2d 874; *People v Brnja,* 50 NY2d 366, 372), he was in effect released from custody when he agreed to leave with the police. Thus, the court held that Dyla's right to be free from unreasonable seizures (US Const 4th, 14th Amends; NY Const, art I, § 12) had not been violated.

At Dyla's first trial, the court dismissed the robbery count, and the jury was unable to reach a verdict as to the remaining counts submitted to them. Dyla was retried and was found guilty of three counts of murder in the second degree, and burglary in the first degree. On May 16, 1984, Dyla was sentenced to concurrent sentences of 25 years to life for the three murder counts and of 6 to 12 years for the burglary count. This appeal followed.

### III

Dyla argues that he was illegally arrested by Parole Officer Burford on April 12, 1982, because no parole violation warrant had been obtained pursuant to the applicable law (Executive Law § 259-i [3] [a] [i]; 9 NYCRR 8004.2). From this premise, Dyla concludes that his subsequent confession must be suppressed as the "fruit" of an illegal arrest (see, *Taylor v Alabama,* 457 US 687; *Rawlings v Kentucky,* 448 US 98; *Dunaway v New York,* 442 US 200, 206-211; *Brown v Illinois,* 422 US 590, 597-599; *Wong Sun v United States,* 371 US 471, 479-486; *People v Rogers,* 52 NY2d 527, 532-533, *cert denied* 454 US 898, *reh denied* 459 US 898).

■ ■ There are at least two flaws in this argument. The more basic of these is that the arrest of Dyla by his parole officer, which was unquestionably based on probable cause to believe that he had committed multiple parole violations, was not an unreasonable seizure in contravention of the standards set forth in the Federal or State Constitution (US Const 4th, 14th Amends; NY Const, art I, § 12). Although the arrest could be viewed as unauthorized under State law in that no parole violation warrant had been obtained, it does not follow that the exclusionary rule should be applied as a remedy for

_____

to release Dyla to the police, a parole violation warrant would have been obtained.

this nonconstitutional irregularity. This issue will be discussed further in section V *(infra)*.

■ The second flaw in Dyla's argument is that, even if we were to assume that the absence of a parole violation warrant rendered Dyla's arrest an unconstitutional seizure, there is support in the record for the County Court's finding that the taint caused by this illegality was dissipated prior to the time that Dyla confessed.

It is established Fourth Amendment doctrine that the mere fact that a confession is made after an unconstitutional arrest does not warrant application of the exclusionary rule. The taint of an unconstitutional arrest may be dissipated prior to the making of a custodial confession *(see, Nardone v United States,* 308 US 338, 341; *see also, Rawlings v Kentucky, supra,* at 106-110; *Brown v Illinois, supra,* at 600-604; *Wong Sun v United States, supra,* at 491-492; *People v Graham,* 90 AD2d 198, 200-203, *cert denied* 464 US 896, *reh denied* 464 US 1005). Although a knowing and voluntary waiver by a defendant of his *Miranda* rights will not alone operate to dissipate the taint of an unconstitutional arrest, such a waiver, along with several other factors, is to be considered in deciding whether such taint has been sufficiently purged, so as to allow admission of the otherwise voluntary confession *(see, Rawlings v Kentucky, supra,* at 107-108; *Brown v Illinois, supra,* at 601-605; *Dunaway v New York, supra,* at 216-219; *People v Conyers,* 68 NY2d 982, 983).

In the present case, Dyla's confession was preceded by a knowing and intelligent waiver of his *Miranda* rights, which is demonstrated by the evidence contained in the record of the pretrial hearing.

Equally as germane to the resolution of this issue is the fact that there was a significant intervening event which occurred between the time of Dyla's initial arrest and the time of his confession. Specifically, the court found that Dyla was released after his illegal arrest and was thus essentially free to choose between going with the police or going elsewhere. Under this interpretation of the evidence, Dyla's incipient parole revocation proceeding had been completely abandoned once Dyla agreed to speak with the police. This view of the evidence is supported by testimony, including that of Detective Abbondandelo, who stated that if, after having left the parole office and while on the way to police headquarters, Dyla had requested to be released, he "would have let him go". From this evidence

and considering all of the other circumstances revealed in the record, it could be found that a reasonable person in Dyla's position, at the time of his transfer from the parole office to police headquarters, would have thought himself free to leave, so that at that point he was not in custody *(see, People v Hicks,* 68 NY2d 234, 240; *People v Yukl,* 25 NY2d 585, 589, *mot to amend remittitur denied* 26 NY2d 845, 883, *cert denied* 400 US 851; *People v Wroblewski,* 109 AD2d 39, 42, *affd* 67 NY2d 933, *cert denied* 479 US 845; *People v Bailey,* 140 AD2d 356). We therefore affirm the County Court's finding of fact that Dyla was released from the custody of his parole officer immediately after he expressed a willingness to cooperate with the police.[2] Given the fact that Dyla was released from the custody of his parole officer, any taint caused by the supposedly unconstitutional arrest must be deemed to have been dissipated prior to Dyla's confession *(see, Nardone v United States, supra; People v Rogers,* 52 NY2d 527, *supra).*

Furthermore, there is another factor, consideration of which necessitates the conclusion that the taint caused by Dyla's original arrest had been attenuated by the time he confessed. In *Brown v Illinois* (422 US 590, 604, *supra),* the Supreme Court of the United States identified the "flagrancy of the official misconduct" as one of the factors to be considered in deciding a taint-attenuation issue *(see also, Rawlings v Kentucky, supra,* at 109-110). In the present case, whatever misconduct may have been committed by parole officer Burford in arresting Dyla without a warrant cannot be attributed to the homicide detectives who scrupulously respected Dyla's rights at every turn.

The case of *People v Martinez* (37 NY2d 662) is illustrative. In that case, the defendant was arrested after police officers had discovered a gun in a car in which he was a passenger during the course of an illegal stop. The illegally seized gun

---

2. As we noted, certain testimony of Parole Officer Burford suggests that the parole revocation procedure might have been resumed, and that Dyla might have been returned to his custody, if Dyla had at any point stopped cooperating with police. However, Burford's view of the situation does not necessarily coincide either with that of the police officers or with that of Dyla himself, or, most importantly, with the view which a reasonable man in Dyla's position would have had. Even if we were to find that Dyla was not free to go after his transfer to the police, but was instead given the Hobson's choice of whether to be in custody at the parole office or at police headquarters, so that he was in fact in custody continuously, we could still hold suppression unwarranted for the reasons discussed in section V of this opinion.

was held to be subject to suppression in the ensuing weapons prosecution as the fruit of an unconstitutional seizure. However, certain statements made by the defendant to homicide detectives, who interviewed him while he was in custody after his arrest but in connection with an entirely separate investigation, were held admissible. The court relied in part on the good faith of the homicide detectives who had not participated in the illegal stop in holding that suppression of the defendant's statements was not warranted in the homicide prosecution (see also, People v Conyers, 68 NY2d 982, supra [good faith of officers who arrested the defendant in home without warrant prior to decision in Payton v New York, 445 US 573, relevant to attenuation issue]; People v Morales, 42 NY2d 129, 137; People v Minley, 112 AD2d 712, affd 68 NY2d 952).

In this connection, we note that the County Court's finding of fact that the homicide detectives in this case were operating completely independently of the parole officer is supported by the evidence and is thus affirmed. Parole Officer Burford's arrest of Dyla was for parole purposes only; he was not acting as a "conduit" for the police (cf., People v Mackie, 77 AD2d 778; People v Candelaria, 63 AD2d 85, 90), and the arrest for a parole violation was not a "pretext" for the arrest of Dyla on a charge of homicide (cf., People v Cypriano, 73 AD2d 902; see also, People v Frankos, 110 AD2d 713). Therefore, whatever constitutional taint may have been caused by Dyla's arrest without a parole violation warrant was sufficiently attenuated prior to Dyla's confession.

## IV

Even if we were to assume that the arrest of Dyla without a parole violation amounted to an unconstitutional seizure, any taint caused by that arrest was dissipated once the homicide squad detectives, who had played no role in the illegal arrest, obtained the consent of Dyla's parole officer to allow Dyla to be released so that he could assist them in their investigation. However, on appeal Dyla raises the separate contention that, even if he were to be considered as having been released from custody at that stage, he was later taken back into custody after he was informed that he had failed the polygraph test. This is an issue with respect to which we do not have the benefit of specific findings of fact by the County Court.

In deciding whether Dyla was in custody after he learned of the results of the polygraph test, we must consider whether,

under those circumstances, a reasonable person would have considered himself unable to leave at that point *(People v Hicks, supra; People v Yukl, supra; People v Patrick,* 130 AD2d 687, 688, *lv denied* 70 NY2d 753; *People v Hall,* 125 AD2d 698, 700). Although he had been informed that the polygraph results were not admissible in evidence *(People v Leone,* 25 NY2d 511), Dyla, even had he been totally innocent, might well have reasonably believed that, based on the results of the polygraph, the police would not permit him to leave, at least until he could somehow demonstrate his innocence *(see, People v Johnson,* 112 Misc 2d 590, 593).

■ Considering all the circumstances of this case, we conclude that Dyla's learning of the polygraph test results did not transform his noncustodial status into a custodial one. He had been specifically advised by the polygraph examiner that he was free to leave police headquarters at any time and he had been repeatedly told that in the eyes of the law the results of polygraph tests were worthless. Detective Abbondandelo testified that Dyla's having failed the polygraph merely elevated Dyla's status as a suspect "a little bit more"; it cannot be inferred from this testimony that the police considered Dyla to be in custody at that point. A reasonably intelligent (and innocent) man, under these circumstances, would not have concluded that, because of the polygraph test results alone, he would be physically restrained if he sought to leave. Dyla was therefore not under arrest at this point.

In light of this finding of fact, we need not address the question whether, as the People argue, the results of the polygraph test, in combination with other factors, gave rise to probable cause to arrest.

## V

■ At this stage, it is appropriate to recall our earlier observation that the defendant's major argument, i.e., that the taint of his illegal arrest requires the suppression of his subsequent statements, suffers from an infirmity even more basic than those previously discussed. This infirmity arises from the erroneous assumption that the exclusionary rule applies where the illegal police conduct in question violates statutory (in this case, Executive Law § 259-i) but not constitutional precepts, particularly where there is no bad faith shown on the part of the police, and where the statute in question is not designed to implement Fourth Amendment rights. The

exclusion from evidence of a voluntary confession is warranted pursuant to New York statutory and constitutional law only when it is shown that the confession has been obtained in violation of a constitutionally protected right of the accused. In the present case, no such violation occurred, simply because parolees have no constitutional right to be arrested only pursuant to a warrant.[3]

## A

We are inclined to hold that neither the Federal nor the State Constitutions (US Const 4th, 14th Amends; NY Const, art I, §§ 6, 12), according to their language and history, require the suppression of evidence gathered as a result of a "seizure" which is not "unreasonable" and hence not unconstitutional, solely on the grounds that the seizure may be considered violative of some State statute, ordinance or regulation. The proposition that the Due Process Clause of either the Federal or State Constitutions (US Const 14th Amend; NY Const, art I, § 6) requires suppression of evidence, even where no violation of any provision contained in those Constitutions has occurred (e.g., US Const 4th Amend; NY Const, art I, § 12) is, in our view, questionable. We acknowledge that precedent exists which could be interpreted as supporting that proposition. However, we find that precedent contrary to more persuasive precedent which holds that such a proposition is incorrect.

In two cases decided before *Mapp v Ohio* (367 US 643), the United States Supreme Court held that evidence gathered in violation of certain statutory limitations should be suppressed *(Miller v United States,* 357 US 301; *United States v Di Re,* 332 US 581). In *Miller (supra,* at 306, n 5), the Supreme Court ordered the suppression of evidence seized after police officers forcefully entered the defendant's premises, without first announcing their "authority and purpose" pursuant to the applicable District of Columbia statute *(see also, Sabbath v United States,* 391 US 585). In *Di Re (supra),* the Supreme Court ordered the suppression of evidence seized by an officer incident to 'an arrest which was technically illegal because it

---

3. Although a parole officer is a "peace officer" (CPL 2.10 [23]) authorized to make warrantless arrests for an "offense" under defined circumstances *(see,* CPL 140.25), the People do not argue, and we therefore do not decide, whether a violation of parole constitutes an "offense" *(see,* Penal Law § 10.00 [1]) so that the warrantless arrest may be validated on this basis.

violated a former New York State statute which permitted a police officer to make a warrantless arrest for a misdemeanor only if he believed that the misdemeanor had occurred in his presence.

It is important to note that both *Miller (supra)* and *Di Re (supra)* were Federal prosecutions. It is clear that, in suppressing the evidence seized in violation of these particular statutes, the Supreme Court was not establishing any rule of Federal constitutional law which would be binding on the States; instead, the Supreme Court was acting in its supervisory capacity over the Federal courts *(see, Street v Surdyka,* 492 F2d 368; 1 LaFave, Search and Seizure § 1.5 [b], at 106-107 [2d ed]). It is also important to note that the more recent case of *United States v Caceres* (440 US 741, *supra* [holding that suppression is not warranted as a remedy for violation of Internal Revenue Service regulations]), while possibly distinguishable from *Miller (supra) (see, United States v Caceres, supra,* at 755, n 21), could be viewed as inconsistent with it.

We do not believe that the Supreme Court has ever held that, as a matter of Federal due process (US Const 14th Amend), State criminal courts must always suppress evidence which has been gathered in a manner consistent with the Federal Constitution, but in violation of some State law or ordinance, however technical. We recognize that there is dicta in the plurality decision in *Ker v California* (374 US 23, 37-38) which suggests that evidence seized pursuant to an arrest which was violative of State law (because the police officers had not announced their authority and purpose before entering the defendant's premises *[cf., Miller v United States, supra]),* must be suppressed in a State court prosecution, even though the arrest would not have been considered unconstitutional. This statement was, as noted, purely dicta, since the plurality in *Ker* concluded that the "knock and announce" statute at issue in that case had, in fact, not been violated.

It is interesting to note, however, that in *People v Floyd* (26 NY2d 558, 563) the Court of Appeals interpreted the *Ker* case as having given "constitutional dimension * * * to the statutory and common-law requirements for notice on breaking into and entering premises for purposes of effecting an * * * arrest". Thus, in *Floyd (supra),* the Court of Appeals ordered the suppression of evidence which was gathered pursuant to an arrest which was effected in violation of New York's so-called "knock and announce" statute *(see,* CPL 120.80 [4]; 140.15 [4]). This was done, apparently, on the assumption that

a violation of that statute necessarily constituted a violation of the Federal and State Constitutions (US Const 4th, 14th Amends; NY Const art I, § 12; *see also, State v Valentine,* 264 Ore 54, 504 P2d 84, 85, *cert denied* 412 US 948; *see, contra, State v Vrtiska,* 225 Neb 454, 406 NW2d 114, 121, *cert denied* — US —, 108 S Ct 180 *[Ker* did not hold that the Federal Constitution requires officers to "knock and announce" prior to entrance into premises]). However, in *People v Payton* (45 NY2d 300, 314-315, *revd on other grounds* 445 US 573), the Court of Appeals held that suppression was not warranted where there occurred a technical violation of the so-called "knock and announce" rule.

The case of *People v Caliente* (12 NY2d 89, 93-95) might also lend itself as support for the rule that suppression is required where evidence is seized in violation of statute, although not in violation of the Federal Constitution. In *Caliente (supra),* the Court of Appeals ordered the suppression of evidence seized as incidental to a warrantless misdemeanor arrest which, because the misdemeanor had in fact not occurred in the presence of the officer, was illegal under former New York law. While the Court of Appeals stated that "it may well be true" *(People v Caliente, supra,* at 95) that probable cause to arrest existed, the court did not make explicit whether it considered the arrest to have been a reasonable and hence constitutional "seizure". Thus, it is not absolutely clear that the suppression of evidence ordered by the *Caliente* court rested on the basis of a statutory violation *alone.*

If cases such as *Caliente (supra)* and *Floyd (supra)* were construed as having announced an all-embracing rule of law requiring the suppression of all evidence seized in compliance with the Federal Constitution, but in violation of statute, then such a rule would be in direct conflict with other cases in which the Court of Appeals has explicitly held that suppression is not required as a remedy for merely statutory violations. In *People v Dinan* (11 NY2d 350, *remittitur amended* 11 NY2d 1057, *cert denied* 371 US 877), for example, the Court of Appeals held that evidence gathered by way of a wiretap, which was illegal because it violated a Federal statute, could be used in the courts of this State, because it had not been gathered in violation of the Federal Constitution. "A distinction was drawn in [the *Dinan]* case between the violation of a Federal statute and the violation of a constitutional prohibition" *(People v Corbo,* 17 AD2d 351, 356). "[E]vidence captured by the police contrary to laws other than the Fourth Amend-

ment may be accepted by the State courts" *(Sackler v Sackler,* 15 NY2d 40, 43, citing *Schwartz v Texas,* 344 US 199; *People v Dinan, supra).* "[T]he exclusionary rule has been held to be in force only as a sanction to the constitutional protection against unreasonable searches and seizures afforded by the Fourth Amendment to the United States Constitution and not to be required in case of a mere statutory violation" *(Sackler v Sackler, supra,* at 46 [Van Voorhis, J., dissenting]).

This court has also recognized the distinction to be drawn between constitutional and statutory limitations when it comes to application of the exclusionary rule. In *People v Varney* (32 AD2d 181, 182) the court, in an opinion by then Presiding Justice Beldock, refused to suppress evidence seized pursuant to a defective search warrant because "[t]he infirmity of the search warrant herein [was] not constitutional in nature but [was] a failure to comply with a statutory requirement".

The idea that the suppression of evidence seized in violation of statutory rules is generally not necessary in the absence of a constitutional violation is borne out in several areas. For example, although CPL 140.20 (1) and 120.90 (1) require arresting police officers to bring arrestees before a court for arraignment "without unnecessary delay", violation of these sections has never been held to require the suppression of confessions made during a prearraignment delay which, strictly speaking, would not have been absolutely necessary *(see, People v Hopkins,* 58 NY2d 1079, 1081; *People v Dairsaw,* 46 NY2d 739; *People v Dobranski,* 112 AD2d 541). Most jurisdictions interpret similar statutes in this way *(see, e.g., O'Neal v United States,* 411 F2d 131, 136-137; *People v Porter,* 742 P2d 922 [Colo]; *State v Wiberg,* 296 NW2d 388 [Minn]).

New York courts also have agreed with the view that evidence seized pursuant to a warrant which improperly authorizes a nighttime search, in violation of statute, need not be suppressed *(People v Glen,* 30 NY2d 252, 262; *United States v Anderson,* 851 F2d 384; *United States v Searp,* 586 F2d 1117, 1121-1122; *United States v Burke,* 517 F2d 377; *Gamble v State,* 473 So 2d 1188, 1195-1196 [Ala]; *State v Brock,* 294 Ore 15, 653 P2d 543; *Commonwealth v Johnson,* 315 Pa Super 579, 462 A2d 743; *see also, People v Frange,* 109 AD2d 802 [failure to return warrant in timely manner "ministerial" error not warranting suppression]; *People v Varney,* 32 AD2d 181; *People v Crispell,* 110 AD2d 926, 927 ["technical" defects in

warrant do not require suppression]; *People v Vara,* 117 AD2d 1013; *People v Hernandez,* 131 AD2d 509).

In *Matter of Emilio M.* (37 NY2d 173), the Court of Appeals held it was error to suppress a confession which had been taken from a juvenile suspect in violation of Family Court Act former § 724, even though, as observed by the court in *Matter of Luis N.* (112 AD2d 86), compliance with the statute would have been possible. In *People v Coffey* (12 NY2d 443, 453) the Court of Appeals stated that it was doubtful whether a violation of a statute which required an arresting officer to advise the arrestee of the cause for the arrest would make the arrest illegal "to the extent of making seized evidence inadmissible" (*cf., Ford v State of New York,* 21 AD2d 437, 440).

On the other hand, we must acknowledge the existence of precedent, in different areas, where suppression has been ordered, although no unconstitutional violation appears to have occurred. In certain cases, for example, suppression has been ordered where evidence had been seized pursuant to a warrant issued by a court which lacked territorial jurisdiction (*see, e.g., People v Hickey,* 40 NY2d 761; *cf., People v Fishman,* 40 NY2d 858; *cf., United States v Comstock,* 805 F2d 1194 [5th Cir]; *People v Mordell,* 55 Mich App 462, 223 NW2d 10). In contrast, courts in most other States hold that where a police officer exceeds his territorial jurisdiction, evidence gathered as a result is not necessarily subject to suppression (*see, People v Vigil,* 729 P2d 360 [Colo]; *People v Hamilton,* 666 P2d 152, 155-156 [Colo]; *People v Wolf,* 635 P2d 213 [Colo]; *State v Bonds,* 98 Wash 2d 1, 653 P2d 1024, *cert denied* 464 US 831; *State v Schinzing,* 342 NW2d 105 [Minn]; *State v Rocheleau,* 142 Vt 61, 451 A2d 1144, 1147; *State v Fixel,* 744 P2d 1366 [Utah]).

As the foregoing discussion reveals, no sweeping statement may be made with respect to the application of the exclusionary rule to evidence seized in violation of statute. Perhaps it is necessary to distinguish between statutes which relate to jurisdiction (*see, e.g., People v Hickey, supra*) and statutes which are purely procedural. It may also be necessary to distinguish between statutes which protect the public-at-large from police intrusions (*e.g.,* "knock and announce" statutes such as that under review in *People v Floyd [supra],* and *People v Payton [supra],* or statutes governing the nighttime execution of search warrants) and statutes which have no such purpose. Perhaps we can do no better than distinguish between statutes which are designed to protect substantial

privacy interests and statutes which are not. There is, however, a distinct trend in this area of the law toward a recognition that suppression of evidence is not always appropriate as a remedy for violations of technical rules which do not implicate Fourth Amendment rights *(see, e.g., United States v Benevento,* 836 F2d 60; *United States v Janik,* 723 F2d 537, 548; *State v Jones,* 127 NH 515, 503 A2d 802, 806 [suppression not warranted for violation of "knock and announce" statute]; *Rodriguez v Superior Ct.,* 199 Cal App 3d 1453, 245 Cal Rptr 617 [violation of rules concerning nighttime execution of warrants]; *see also, Commonwealth v Lyons,* 397 Mass 644, 492 NE2d 1142, 1145; *State v Eubanks,* 283 NC 556, 196 SE2d 706, 709; *City of Kettering v Hollen,* 64 Ohio St 2d 232, 416 NE2d 598; *State v Sundberg,* 611 P2d 44 [Alaska]).

Focusing, then, on the narrow question of whether a violation of the statute requiring the issuance of a parole violation warrant (Executive Law § 259-i [3] [a] [i]) requires suppression in this case, we conclude that it does not. As more fully outlined below, this statute is not jurisdictional, it is not meant to protect the privacy of the public and it affects no substantial right. It is purely a technical requirement, the violation of which should not result in the exclusion of evidence. "Suppression of evidence resulting from [an] illegal, but not unconstitutional, arrest is not mandated" (2 Ringel, Searches & Seizures, Arrests and Confessions § 23.9, at 23-50 [2d ed]). Exclusion of evidence obtained as a result of a statutory violation should be suppressed only if the statute "confers a substantial right" which "relate[s] rather closely to Fourth Amendment protections" (1 LaFave & Israel, Criminal Procedure § 3.1 [e], at 146; *see also,* 1 LaFave, Search and Seizure § 1.5 [b], at 101-110 [2d ed]).

B

■ Parolees are, in essence, convicted criminals who are released from prison before the expiration of their term, under supervision, and who are allowed to remain outside the penal institution only on stated conditions. Violation of these conditions results in revocation of parole. "If a parole condition is violated, this forms an independent ground to reincarcerate the individual based on the prior conviction" *(Faheem-El v Klincar,* 841 F2d 712, 724). Recognition of the necessity that parolees be closely supervised in order to protect the public has caused the courts to declare that the Fourth

Amendment protection to be afforded a parolee is significantly less than that which would be afforded to an ordinary civilian *(e.g., People v Huntley,* 43 NY2d 175 [upholding warrantless search of parolee's property in absence of probable cause]). There is no rule of constitutional law which requires that a warrant must be issued prior to the arrest of a parolee known to have committed a parole violation.

For the purposes of determining the scope of their State or Federal constitutional rights, parolees and probationers have generally been treated alike *(see, Gagnon v Scarpelli,* 411 US 778; *Morrissey v Brewer,* 408 US 471). Neither the *Gagnon* nor the *Morrissey* case, which set forth the minimal due process rights of parolees and probationers in connection with revocation proceedings, holds that warrants must in all cases be obtained prior to arrest. There are, in fact, both State and Federal statutes, which have never been declared unconstitutional, which expressly state that probationers may be arrested without the issuance of a warrant *(see,* CPL 410.50; 18 USC § 3653). It would be anomalous to hold that parolees have a constitutional right to be arrested only upon a warrant, while probationers do not have a similar right, particularly since, as a general matter, parolees are guilty of more serious crimes than those who receive probation *(see, Faheem-El v Klincar, supra)* so that parolees should arguably be regulated more closely than probationers. It may also be viewed as anomalous to hold that, in the case of suspected parole or probation violators, arrests may not be conducted without a warrant, while as a matter of constitutional law, searches may *(see, Griffin v Wisconsin,* 483 US 868, 107 S Ct 3164; *cf., People v Jackson,* 46 NY2d 171), even though with respect to ordinary criminal suspects, warrantless arrests are usually more easily justified than warrantless searches.[4]

That a parolee has no constitutional right to be arrested only upon a warrant is further illustrated by the fact that some jurisdictions have, or had, statutes which expressly authorize the warrantless arrest of parole violators *(see, e.g.,*

---

4. Generally, a warrantless search of a suspect's home in the absence of exigent circumstances will be found to be unconstitutional even though probable cause existed *(see, Coolidge v New Hampshire,* 403 US 443; *People v Payton,* 45 NY2d 300, 309, *revd on other grounds* 445 US 573). However, there is, in general, no requirement that police officers obtain a warrant prior to arresting a suspect upon probable cause to believe he has committed a crime *(see, United States v Watson,* 423 US 411, 414-419; *Carroll v United States,* 267 US 132, 156).

*Battle v State,* 254 Ga 666, 333 SE2d 599, 603-604; *Kellogg v State,* 94 Wash 2d 851, 621 P2d 133, 136-137; *People v Weathers,* 40 Ill App 3d 211, 351 NE2d 882, 884). In fact, such arrests were authorized under New York law pursuant to Correction Law former § 829 *(see,* L 1968, ch 658, § 3, repealed by L 1977, ch 904, § 2; *see, People ex rel. Calloway v Skinner,* 33 NY2d 23, 33).

The requirement that the arrest of a parole violator be preceded by the issuance of a warrant (Executive Law § 259-i [3] [a] [i]) is more in the nature of a procedural or "housekeeping" rule than a requirement designed to protect individual liberty. The type of warrant in question is not one issued by a neutral Magistrate; rather, it is issued by an administrative officer who is basically a colleague of the officer who is seeking the warrant *(see,* 9 NYCRR 8004.2 [b]). The failure to obtain a parole violation warrant is particularly excusable where, as in the present case, no decision had been made by the parole officer as to whether to revoke parole until the parolee was actually in the presence of the officer. It has been stated that it would be "absurd" to expect a probation officer to obtain a warrant in order to arrest a probationer who is committing a violation in the officer's presence (Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 410.50, at 262). The same is true with respect to the arrest of a parolee whose violation (e.g., the failure to report police contact) occurs in the presence of a parole officer during an interview.

We are also persuaded by the reasoning expressed in those cases in which it has been held that the exclusionary rule should not apply to the fruits of an arrest which is made in contravention of a State statute authorizing warrantless misdemeanor arrests in the presence of the arresting officer *(see, State v Eubanks,* 283 NC 556, 196 SE2d 706, 708-709, *supra; State v Allen,* 2 Ohio App 3d 441, 442 NE2d 784, 786; *People v Burdo,* 56 Mich App 48, 223 NW2d 358, 360-361). The right of a misdemeanant to be arrested only upon a warrant where his crime took place outside the presence of a police officer is certainly no less fundamental than the right of a parole violator to be arrested only upon a warrant, even where his violation of parole occurs, as it did here, in the presence of his parole officer. It is absolutely clear to us that neither "right" is of constitutional dimension and that a violation of such a right therefore does not warrant the application of the exclusionary rule.

In short, not one of the defendant's constitutional rights were violated in this case. The officers principally responsible for inducing the defendant to confess committed no violations of his rights. The only transgression which occurred was the short-lived arrest of the defendant by his parole officer and this misstep amounts at most to a violation of a procedural statute, rather than to an invasion of the defendant's constitutional right to be free of unreasonable searches or seizures. The harm which would be done to the interests of society at large by the imposition of the exclusionary rule under these circumstances far outweighs the value of any increased discipline which might result among parole officers who are contemplating the making of warrantless parole violation arrests. The suppression of evidence in this case is required neither by the State Constitution nor by any State statute, and we decline to exercise whatever inherent "supervisory power" we may have to nonetheless order suppression. "[I]n certain circumstances the interest of society is better served by having relevant and material evidence admitted in criminal cases than * * * through the exclusion of evidence unlawfully acquired" *(People v Stith,* 69 NY2d 313, 318, citing *Nix v Williams,* 467 US 431, 442-443; *see also, People v McGrath,* 46 NY2d 12, 31; *People v Rogers,* 52 NY2d 527, *supra).* We conclude that the initial arrest of Dyla by his parole officer on April 12, 1982, did not constitute a violation of his constitutional right to be free of unreasonable seizures. Even if the arrest was in technical violation of Executive Law § 259-i (3) (a) (i), suppression of defendant's subsequent confession is not warranted either as a matter of our supervisory power over the trial courts or as a matter of State statute, or as a matter of Federal or State constitutional law. For this reason, in addition to those outlined in sections III and IV, *supra,* we conclude that the defendant's motion to suppress was properly denied.

## VI

■ ■ The defendant raises several other points, both in the brief of assigned counsel and in his *pro se* brief. These have all been examined and found to be without merit. We note specifically that there is no merit to the defendant's argument that his statements to police were extracted in violation of his privilege against self-incrimination on the grounds that he subjectively believed that if he did not tell the truth, his parole would be revoked. Even assuming that the defendant

had such a perception, it would not have been a reasonable one, because the State may not punish a parolee for invoking his Fifth Amendment privilege by revoking his parole *(see, Minnesota v Murphy,* 465 US 420, 438-440). Further, we find that the interrogation techniques employed by police were not violative of due process *(see generally, People v Tarsia,* 50 NY2d 1, 11-13; *People v Anderson,* 42 NY2d 35, 38; *see also, People v Baity,* 139 AD2d 521; *People v Madison,* 135 AD2d 655). Specifically, there was no abuse of the polygraph, since there is no evidence that the polygraph examiner deceived the defendant with respect to the accuracy of the procedure, or with respect to his own conclusions as to the defendant's veracity *(see, People v Gerald,* 128 AD2d 635, 636 [misuse of polygraph one factor in determining voluntariness of postpolygraph confession]; *People v Zehner,* 112 AD2d 465; *People v Knighton,* 91 AD2d 1077, 1078; *People v Cavagnaro,* 88 AD2d 938; *cf., People v Leonard,* 59 AD2d 1).

The defendant's claim based on double jeopardy is likewise without merit *(see, Matter of Napoli v Supreme Ct.,* 33 NY2d 980). The judgment under review should accordingly be affirmed.

MANGANO, J. P., LAWRENCE and SPATT, JJ., concur.

Ordered that the judgment is affirmed.