OPINION OF THE COURT
Thomas A. Demakos, J.
*47 The defendant, James Allen Gordon, was indicted forl2 counts of murder in the first degree, six counts of murder in the second degree and 15 additional related offenses. The indictment alleges, inter alia, that on July 10, 1996, the defendant, during the commission of enumerated felonies, caused the death of Darlene Johnson, Hadiyah Holliman and Mary Mouzon, and attempted to cause the death of Latisha Grite. On December 8, 9, 10, and 11, 1997, a combined Dunaway IMappI Wade I Huntley hearing was conducted before me.
FINDINGS OF FACT
During the early morning hours of July 10, 1996, a miscreant entered and remained in the premises located at 106-03 177th Street, Queens County, and approximately two and a half to three hours later when he left, three women were dead and one young woman, Latisha Grite, was severely injured. Numerous police officers and detectives responded to aid in the investigation of this carnage and although the probe was spearheaded by Lieutenant Hunt, the lead detective was Detective Piretti, joined by Detectives Sica, Sanchez and Cortez.
Police officers also assisted in this multiple homicide investigation and immediately canvassed the vicinity surrounding the crime scene. During this canvass, police officers and detectives spoke to a civilian witness, Tyrell Frazier, whose information proved valuable to the focus of the investigation. Frazier was thereafter transported to the 103rd Detective Squad for further interviews and by 8:00 a.m. that morning, Detective Piretti met Frazier and began her interview with him. Frazier informed the detective that the evening before he had been drinking with “Black” at Liberty Park. After midnight, they decided to leave and while driving home in Black’s girlfriend’s car, they had an automobile accident. Shortly thereafter, they saw a woman who Black knew, Mary Mouzon, and other females going into Mary’s apartment, which was across the street from Black’s residence. Black spoke to them and Frazier overheard the women tell Black to come back later. Tyrell Frazier also told the detective that later that night he observed Black running across the street to his (Black’s) residence carrying a bag. Frazier then described how he had also seen one of the young women, who had been with Mary Mouzon earlier that evening, sitting in a patrol car. When Frazier approached her, she told him that Black had shot Mary and the girls and that she had escaped by jumping out of the window. Frazier told Detective Piretti that he had known Black *48 from the neighborhood, that he did not know his real name, but that he knew that Black had another nickname, Raheem, and that he knew Black was on parole.
After her conversation with Frazier, Detective Piretti learned from other officers that Black’s address might be 105-14 177th Street, which was across the street from the crime scene. She ran a CARS computer check on that address and learned that two males residing at that address had been previously arrested, one of which was James Allen or Allen James. She further learned that James Allen was out on parole. Detective Piretti then checked a parole book at the 103rd RIP Unit and discovered a picture of James Allen. At approximately 8:30 a.m., Detective Piretti returned to Frazier, showed him the page from the parole book, which contained the picture of James Allen and seven other men, four on each side, and asked if he could identify anyone. Frazier looked at both sides of the page and pointed to the picture of James Allen as the person he knew as Black, or Raheem, and who was the person he had been with the preceding evening and the person of whom he spoke.
Detective Piretti, accompanied by Detective Cortez, immediately proceeded to Mary Immaculate Hospital where Latisha Crite, the young woman who had escaped the carnage the previous evening, had been taken for medical treatment. A statement was taken from her. When Latisha had concluded her statement, Detective Piretti showed her both sides of the parole book page containing the photographs of eight men, and asked if she could identify anyone. Latisha looked at the pictures and pointed to the picture labeled Allen James, Latisha told the detective that he was the male who had shot and killed Mary and Hadiyah and who had strangled her.
Upon receiving these positive identifications from both Tyrell Frazier and Latisha Crite, Detective Piretti contacted the New York State Division of Parole and spoke to parole personnel who supervised parolees in the geographical confines of the 103rd Precinct. She informed them of the statement of Tyrell Frazier regarding the actions of a parolee, James Allen, who was under their supervision and she also informed them of the triple homicide. Supervising Parole Officer Barling, Deputy Regional Director Carl Cornelius and Parole Officer Darcy Ames responded to the 103rd Precinct later that morning and met with Detective Piretti and Lieutenant Hunt to discuss the status of James Allen Gordon, also known as James Allen, also known as Black, also known as Raheem. Mr. Barling explained
*49 to the detectives that prior to Gordon’s release on parole on August 31, 1995, as a condition to that release,[1] Gordon had signed a Certificate of Release[2] which enumerated certain conditions that he agreed to accept. Among these special conditions were Gordon’s waiver of his right to resist extradition[3] and his agreement to observe curfew hours.[4] Mr. Barling further explained that on September 1, 1995, a curfew had been established as a condition of Gordon’s parole and that curfew required that from Sunday through Saturday — seven days a week — Gordon had to remain in his residence from 11:00 p.m. to 7:00 a.m.[5] Upon hearing the statement of Tyrell Frazier, specifically the information regarding the violation of curfew, to wit: that Gordon had been in Liberty Park during his curfew hours, New York State Division of Parole Officers Ames and Cunningham, after consultation with Supervisor Barling regarding Tyrell Frazier’s availability as a witness attesting to Gordon’s violation of curfew, issued a violation of parole warrant[6] for the arrest of James Allen Gordon.[7] This warrant was *50 immediately entered into the National Crime and Information Computer and disseminated nationwide.
Approximately six weeks later, on August 19, 1996, New York City police personnel were notified that the defendant, James Allen Gordon, had been located in Memphis, Tennessee. Detectives Piretti, Cortez, Sica and Lieutenant Hunt traveled to Memphis and arrived at the Memphis police headquarters the following day where they spoke to police personnel. Detective Piretti learned that the defendant Gordon had been located at a rooming house at 1448 Orleans.
At approximately 11:00 a.m. that morning, August 20th, members of the Memphis Police Department accompanied by the New York City detectives responded to that address and surrounded the premises. A member of the Memphis Police Department knocked on the door, and after the door opened, the Memphis officer displayed a picture of James Allen Gordon and asked, “Where’s room number seven?” The person indicated upstairs and the Memphis officers, followed by Detectives Piretti and Sica, went upstairs, knocked twice on the door to room number seven, and James Allen Gordon, also known as James Allen, also known as Black, also known as Raheem, opened the door. When he saw the police personnel, some with their guns drawn, he immediately dropped to the hallway floor, was told to lie face down, and was handcuffed. While being taken into custody, Gordon admitted, “I knew you’d get me.”[8] The defendant was transported by Memphis police vehicle to the Memphis station house and by 11:40 a.m. he was placed in an office. Detectives Piretti and Cortez entered the office, removed his handcuffs and offered him a cigarette. From 11:00 a.m. to 12:00 p.m., an oral statement was taken from the defendant, after he was advised of his Miranda rights. This oral statement was reduced to writing and the interview concluded at 2:00 p.m.
During the afternoon. hours, Shelby County, Tennessee police officials spoke to the New York City officials regarding their forthcoming transferal of custody of the defendant to them and the defendant’s return to New York. Deputy Sheriff Rose telephoned Mr. Barling at the New York State Division of Parole and informed him that James Allen had been located in Tennessee and that detectives from the New York City Police Department were present with a parole violation warrant for him. Upon learning that James Allen had signed a waiver of *51 extradition in August 1995, which had been included in the “Certificate of Release”, Deputy Sheriff Rose requested that the “Certificate of Release” be faxed to him. This document[9] was thereafter transmitted to the Shelby County Police Department. Once additional paperwork which was relevant to this case had been sent to the Memphis Police Department by the Attorney General’s Office of the State of Tennessee,[10] the custody of the defendant was turned over to New York City detectives. Detective Piretti then made arrangements to return to New York with Gordon and after informing him of their upcoming trip, Gordon responded that he was glad to be returning to New York State because the food in Memphis was terrible.
On August 21, 1995, James Allen Gordon was transported back to New York State on the parole warrant. Detectives Piretti, Cortez, Sica and Lieutenant Hunt accompanied the defendant on the return flight and they arrived in the New York metropolitan area at approximately 5:45 p.m. that evening.
Subsequently, New York State Board of Parole members recommended that the charges of Gordon’s parole violations be withdrawn and such action was taken.
CONCLUSIONS OF LAW
Dunamay/Extradition Issues
At a Dunaway hearing, the People have the burden in the first instance of going forward to demonstrate that the arrest of the defendant James Allen Gordon was supported by probable cause (Dunaway v New York, 442 US 200). Preliminarily, probable cause exists where the facts and circumstances known to law enforcement would warrant a reasonable person to conclude, under all the circumstances known to him, that the defendant had committed or was committing a crime (People v Bellinger, 74 NY2d 633; People v Farinaro, 110 AD2d 653).
The evidence adduced at this hearing has clearly established that once Detective Piretti spoke to Tyrell Frazier, she had a detailed description of a suspect involved in the triple homi *52 cide. Using that suspect’s possible address and the additional information that he was a parolee, Detective Piretti ran a CARS check on the suspect’s address, and learned that there was a parolee, James Allen, listed at that address. Detective Piretti obtained the parole book page where his picture was placed, displayed that page to Tyrell Frazier and after Frazier’s recognition of “Black” as the person of whom he had been speaking, Detective Piretti immediately contacted the New York State Division of Parole. Information from an identifiable civilian witness is regarded as circumstantially reliable and may be acted upon by the police (see, e.g., People v Chipp, 75 NY2d 327, cert denied 498 US 833; People v Allen, 209 AD2d 425). Furthermore, once Division of Parole Supervisor Barling, and Parole Officers Ames and Cunningham conferred with detectives, they concluded that inasmuch as Tyrell Frazier was an available witness who could immediately testify at a parole proceeding regarding James Allen Gordon’s violation of curfew, they would issue a violation of parole warrant for Gordon’s arrest.
Preliminarily, Executive Law § 259-c (6) provides that the New York State Board of Parole shall “have the power to revoke the parole or conditional release of any person and to authorize the issuance of a warrant for the retaking of such persons”. Moreover, the lawful mandate of the parole warrant clearly establishes the probable cause to seize the defendant and to take him into custody wherever he can be found (People v Dyla, 142 AD2d 423, 429 [emphasis supplied]). Indeed, the seizure of thé defendant would be lawful and proper even were that seizure effectuated in the parolee’s residence, with or without a warrant, or whether or not such taking would be in violation of Payton v New York (445 US 573 [1980]; United States v Cardona, 903 F2d 60 [1st Cir], cert denied 498 US 1049; see, People v Hernandez, 218 AD2d 167 [2d Dept 1996]). A parolee’s status is, in essence, that of a convicted criminal who is released from prison before the expiration of his term, but who remains under supervision outside the penal institution on stated conditions. Simply put: A violation of parole results in the revocation of parole (People v Dyla, supra, at 439). Thus, the US Constitution Fourth Amendment rights of a person who is actually or constructively in the custody of the New York State Department of Correctional Services, to wit: a parolee, differ markedly from those of citizens in general, or for that matter, citizens under suspicion of criminal conduct (People v Hernandez, supra, at 171).
*53 Applying these principles to the case at bar, the Division of Parole violation warrant was lawfully issued once the parole officers and Supervisor Barling learned of the defendant’s violation of curfew and of the automobile accident. Moreover, once the Memphis Police Department was in receipt of the New York State parole warrant the retaking of the defendant pursuant to the execution of that warrant was proper. Although as a parolee, Gordon had no Payton protections, in any event inasmuch as Gordon’s apprehension was effectuated in the public hallway of the rooming house, and not his private room, Parton issues are inapplicable (People v Marzan, 161 AD2d 416).
Defense counsel contends, both in oral argument and in his memorandum of law, that James Allen Gordon’s arrest on the parole warrant was in fact a pretext, or ruse, employed to arrest him for the triple homicide. Defense counsel’s contention is without merit. The fact that the detectives had information connecting Gordon to the triple homicide does not make an otherwise valid parole warrant invalid. Clearly, after interviewing Tyrell Frazier and Latisha Grite and after obtaining their confirmatory identifications of James Allen Gordon, the detectives did have sufficient probable cause to arrest Gordon and could have obtained an arrest warrant for his apprehension on the triple homicide. That they chose instead to seize Gordon on the parole warrant, rather than on an arrest warrant, in no way minimizes or negates the lawfulness of his arrest on that parole warrant.
Testimony was adduced from numerous witnesses at this hearing regarding discussions between parole officials and police personnel concerning the most expeditious means to apprehend James Allen Gordon. The violation of parole warrant was based upon Tyrell Frazier’s statement and Tyrell Frazier was an available witness for any necessary parole violation proceeding. As noted in one police-generated document,[11] the parole violation was a minor offense but it covered a larger network. Only hours had passed since the discovery of the triple homicide and the identification of a suspect: The parole warrant could be in place immediately; it could be entered into the National Crime and Information Computer; and there was an available witness to testify at a parole violation proceeding. The parole warrant satisfied the exigencies created by the circumstances, especially had the defendant been apprehended *54 within hours after its issuance, rather than weeks, as it was to eventually play out.
Defense counsel negates the validity of this alternate means used to apprehend the defendant. He is mistaken. The police had more than one option at their disposal — that they used another available option neither negates nor vitiates the lawfulness of their actions. Therefore, the defendant Gordon’s arrest on the parole violation warrant was proper and the motion to dismiss on Dunaway grounds is denied.
In August 1995, and while an inmate in a New York State correctional facility, James Allen Gordon, in anticipation of his release on parole, was required to sign a Certificate of Release to Parole Supervision which included certain conditions that he agreed to accept as conditions to his release. One condition of release was Gordon’s express waiver of his right to resist extradition.[12] Thus, on August 20, 1996, when Gordon was arrested in Tennessee by Memphis police personnel, he was returned to the State of New York pursuant to the execution of his waiver of extradition. Defense counsel argues that the transportation of the defendant from Tennessee to New York upon the basis of that parole Certificate of Release waiver was illegal and improper and that lawful police conduct would have necessitated that Gordon appear before a local Tennessee court. Defense alleges that inasmuch as Gordon’s statements are the fruits of such illegality, they must be suppressed. Defense counsel’s argument is unpersuasive.
Preliminarily, the procedures for returning a fugitive to a demanding State are set forth in the Uniform Criminal Extradition Act (hereinafter UCEA), as codified in New York State as CPL article 570 and in Tennessee as Tennessee Code Annotated § 40-9-101 et seq. Specifically, CPL 570.50 discusses the written waiver of extradition proceedings, concluding with the proviso “that nothing in this section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding state, nor shall this waiver procedure be deemed to be an exclusive procedure or to limit the powers, rights or duties of the officers of the demanding state or of this state.” Thus, the statutory procedures of CPL article 570 are not exclusive and waivers of extradition need not conform strictly to the procedures set forth in the UCEA. Further, whether or not a presigned waiver of extradiction will be enforced in New York State is an issue which has not been *55 definitively resolved,[13] and this court must look to the facts and circumstances of this case to determine the issues before it.
The evidence adduced at this hearing has demonstrated that prior to his release from the correctional facility, the defendant Gordon voluntarily and knowingly signed the waiver of extradition after each and every aspect of it had been explained to him by Parole Officer Joyce. When the defendant chose to sign the waiver, the benefit derived was that his status would become that of a parolee and not of an inmate, for had he chosen not to sign the waiver, he would not have been released. Clearly, the choice was Gordon’s to make.
Furthermore, once he was in the custody of the Memphis Police Department, Deputy Sheriff Rose contacted the New York State Division of Parole and requested that they fax him the waiver of extradition that Gordon had executed. Upon receipt of Gordon’s waiver of extradition, Memphis police personnel contacted the State of Tennessee Attorney General’s Office and, in turn, were faxed Opinion No. 589,[14] which provided that “formal extradition should not be necessary to return a parole violator to the paroling state, where the parolee has knowingly and understandingly signed a prior waiver of extradition as a condition of release”. Although Opinion No. 589 refers to parolees from sister States who are under Tennessee supervision pursuant to a compact under the Uniform Act for Out-of-State Parolee Supervision, which is clearly not the situation at bar, this court holds that the Memphis police authorities’ reliance upon such opinion, without more, was neither unreasonable nor untenable. Inasmuch as both Tennessee and New York adhere to the Parolee Supervision Act, the Memphis police personnel’s reliance upon Opinion No. 589 was logical and did not vitiate the legality of the defendant’s subsequent extradition to the State of New York. Accordingly, once the Memphis police personnel were in receipt of these documents, they, in turn, relinquished custody of Gordon to the members *56 of the New York City Police Department and preparations were begun for the return trip to New York State.[15]
Notwithstanding this court’s conclusion that James Allen Gordon’s waiver of extradition was freely made and that his resultant return to New York State on that waiver was lawful and proper, even had the Memphis authorities, acting in good faith, unknowingly misapplied the law, once the defendant entered this State, New York courts had jurisdiction over him (cf, Frisbie v Collins, 342 US 519; People v Walls, 35 NY2d 419). In a proper case this State may decline to exercise its jurisdiction, rather than exploit the fruits, if any, of unauthorized conduct (see, e.g., Ker v Illinois, 119 US 436), but even were there a breach in this situation, which this court finds there was not, the breach would not be of such a nature to warrant this sanction, particularly in view of this court’s factual determination that the officers acted in good faith and did not deprive the defendant of his statutory rights (People v Walls, supra; People v Sampson, 73 NY2d 908).
Accordingly, it is the decision of this court that the defendant’s motion to suppress as a result of a Dunaway violation or as a result of his unlawful and improper extradition to New York State from the State of Tennessee is denied in all respects.
[Portions of opinion omitted for purposes of publication.]

. New York State Division of Parole Officer Larry Joyce testified that it was his job to assign out prisoners to parole supervision. Although he had no independent recollection of seeing Gordon sign the papers, it was his responsibility to explain each and every aspect of the “Conditions of Release” to each and every inmate prior to parole. If a parolee refused to sign the “Conditions of Release”, that parolee would not be released.

. The Certificate of Release was deemed marked as People’s No. 8.

. “Paragraph Ten: In the event that I leave the jurisdiction of the State of New York, I hereby waive my right to resist extradition to the State of New York from any state in the union and from any territory or country outside the United States. This waiver shall be in full force and effect until I am discharged from parole or conditional release. I fully understand that I have the right under the Constitution of the United States and under law to contest an effort to extradite me from another state and return me to New York. I freely and knowingly waive this right as a condition of my parole and conditional release.”

. “Paragraph Four: I will observe any specific curfew as established by my parole officer.”

. The Division of Parole record establishing the specific curfew of James Allen Gordon was deemed marked into evidence as People’s No. 9.

. The parole warrant issued for the arrest of James Allen Gordon was deemed marked in evidence as People’s No. 10.

. A stipulation, court exhibit No. 2, was entered into at this hearing between the People and the defense that a supervisor in the New York Police Department whose identity was unknown, wrote a memo in which, among other statements, the supervisor stated that “Probation was present at the 103 Precinct and indicated that they would put a wanted notice out for this guy because he violated curfew. It is a minor offense however it will cover a larger network.”

. Hearing transcript, Dec. 8, 1997, at 50.

. The two-page “Certificate of Release to Parole Supervision” was deemed marked into evidence as People’s No. 6.

. These documents were deemed marked into evidence as People’s No. 7 and also defendant’s E. Included within these documents was the Tennessee Attorney General’s Opinion No. 589, regarding parolees from sister States who are under Tennessee supervision pursuant to a compact under the Uniform Act for Out-of-State Parolee Supervision. Such opinion provides that “formal extradition should not be necessary to return a parole violator to the paroling state, where the parolee has knowingly and understandingly signed a prior waiver of extradition as a condition of release”.

. Stipulation, court exhibit No. 2, see, n 1.

. See, n 9.

. Compare, e.g., People v Issacs (139 Misc 2d 323), with People v Lattimore (138 Misc 2d 20) and People v Pike (NYLJ, Aug. 1, 1997, at 22, col 2); see also, People v Bynul (138 Misc 2d 326). However, as noted by Professor Peter Preiser, Practice Commentaries (McKinney’s Cons Laws of NY, Book 11A, CPL 570.50, at 240), “from a practical standpoint, considering the limited issues that can be raised to contest extradition * * * in a case where the person has signed a waiver in the demanding state as a condition of parole or probation after conviction there * * * it is difficult to conceive of any matter other than of identity which could be raised to challenge * * * extradition.”

. See, n 7.

. Indeed, the hearing evidence demonstrated that Gordon was anxious to leave the State of Tennessee, complaining that the food was terrible.